*160 OPINION OF THE COURT
Bellacosa, J.
The dispositive feature of this case, in which plaintiff Northeast seeks to recover a finder’s fee, is whether the finder-seller agreement between the parties created a relationship of trust between them producing a fiduciary-like obligation on the finder. The particular facet of this case devolves from a duty imposed by the lower courts on the finder to disclose adverse reputational information about the prospect tendered to its client, Wellington, the failure of which disentitles the finder of its otherwise earned fee.
This Court granted leave to appeal from the Appellate Division order, which affirmed Supreme Court’s grant of defendants’ CPLR 4404 (a) motion to set aside the jury verdict that would have awarded plaintiff finder its fee for services rendered. Defendants persuaded Supreme Court that Northeast violated a newly notched finder’s fiduciary-like obligation when it failed to disclose the adverse reputation information about the prospect.
We reverse the Appellate Division order affirming the holding of the Supreme Court and reinstate the verdict of the jury. In these circumstances, a fiduciary relationship does not arise by operation of law, but must spring from the parties themselves, who agree to and accept the responsibilities that flow from such a contractual fiduciary bond. Courts look to the parties’ agreements to discover, not generate, the nexus of relationship and the particular contractual expression establishing the parties’ interdependency. Finders have a recognized role in the law and perform a fairly customary market service. Unless the particular agreement establishes a relationship of trust, one will not spring from a finder’s contract in and of itself, for without some agreed-to nexus, there is no relationship of trust and, thus, no duty of highest loyalty. Rather, absent special agreement or special circumstances, the forces and mores of the marketplace govern such finder arrangements.
I.
In July of 1988, plaintiff finder Northeast General Corporation, through its agents Dunton and Margolies, entered into an agreement with defendant seller Wellington Advertising, Inc., authorized by its president Arpadi. Northeast was to act "as a non-exclusive independent investment banker and busi *161 ness consultant for the purposes of finding and presenting candidates for purchase, sale, merger, or other business combination.” The agreement further provided that the finder would be entitled to a "Completion Fee when a Transaction is closed within three (3) years after the termination of this Agreement with a party introduced and/or presented by [finder] to [Wellington].” By its terms, the understanding between these parties called for a simple service: the finder was to introduce purchaser "candidates” to Wellington for which the finder would be paid a finder’s fee if a completed transaction ensued.
Margolies, after consultation with Northeast’s new president Dunton, introduced Sternau to Wellington’s Arpadi as a potential purchaser of Wellington. Ultimately, Sternau and Wellington entered into a purchase agreement. The record shows that before introducing Sternau to Wellington, finder’s president Dunton was informed by an unidentified investment banker that Sternau had a reputation for buying companies, removing assets, rendering the companies borderline insolvent, and leaving minority investors unprotected. Dunton did not, prior to the closing of the Wellington-Sternau deal, disclose this adverse information. It is undisputed that after Northeast’s introduction of Sternau to Wellington, prior to the merger agreement, Dunton called Arpadi and offered further help with the transaction. Arpadi declined that help and discouraged Dunton from any further involvement. After the merger agreement, companies controlled by Sternau purchased controlling stock of Wellington, leaving Wellington’s principals, including Arpadi, as minority investors. Ultimately, Wellington was rendered insolvent and Arpadi and other minority investors suffered financial losses.
Wellington delivered a check for Northeast’s finder services, but before it could be negotiated, payment was stopped. Northeast then sued to recover its finder’s fee and, after trial, the jury rendered a verdict with special findings.
Defendants moved to set aside the verdict and to dismiss the action notwithstanding the verdict in favor of plaintiff. Supreme Court granted the motion essentially based on a newly notched fiduciary-like duty on finders, predicated on public policy, not expressly on the parties’ agreement. No special duty to investigate was articulated as part of the new rule, only a duty to disclose known negative reputational information (151 Misc 2d 389, 393). The Appellate Division affirmed by adopting the opinion at Supreme Court (187 AD2d 302).
*162 II.
Before courts can infer and superimpose a duty of the finest loyalty, the contract and relationship of the parties must be plumbed. We recognize that "[m]any forms of conduct permissible in a workaday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties” (Meinhard v Salmon, 249 NY 458, 464). Chief Judge Cardozo’s oft-quoted maxim is a timeless reminder that "[a] trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive” (id., at 464). If the parties find themselves or place themselves in the milieu of the "workaday” mundane marketplace, and if they do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them.
The Northeast-Wellington agreement contains no cognizable fiduciary terms or relationship. The dissent ascribes inordinate weight to the titles nonexclusive independent "investment banker and business consultant” (dissenting opn, at 171, 173). These terms in the context of this agreement are not controlling, since Dunton did not perform the services of an investment banker or consultant. Instead, Dunton’s sole function was "for the purposes of finding and presenting candidates”. That drives the analysis of this case because he was a traditional finder functioning under a finder’s agreement, and his role ceased when he found and presented someone. The finder was not described or given the function of an agent, partner or coventurer. An elongated foot of the Chancellor extends too far with a decree declaring a fiduciary-like duty here. (See, Powell, "Cardozo’s Foot’’: The Chancellor’s Conscience and Constructive Trusts, 56 Law & Contemp Probs 7 [1993].) Such a ukase earns small jurisprudential profit in this commonplace field of commercial transaction. Probing our precedents and equitable principles unearths no supportable justification for such a judicial interposition, however highly motivated and idealistic. Indeed, responding to this fine instinct would inappropriately propel the courts into reformation of service agreements between commercially knowledgeable parties in this and perhaps countless other situations and transactions as well.
Also, a finder is not a broker, although they perform some related functions. Distinguishing between a broker and finder *163 involves an evaluation of the quality and quantity of services rendered. The finder is required to introduce and bring the parties together, without any obligation or power to negotiate the transaction, in order to earn the finder’s fee (Ames v Ideal Cement Co., 37 Misc 2d 883, 886). While a broker performs that same introduction task, the broker must ordinarily also bring the parties to an agreement. A broker in New York, unlike a finder, thus carries a defined fiduciary duty to act in the best and more involved interests of the principal (TPL Assocs. v Helmsley-Spear, Inc., 146 AD2d 468; see also, John J. Reynolds, Inc. v Snow, 11 AD2d 653, affd 9 NY2d 785). In this regard, defendants’ effort at analogizing whatever fiduciary-like obligation brokers may have to a finder’s role fails. Moreover, the finder in this case under the terms of the written agreement is definitely not a broker and did not function as a broker.
We note that a finder has far less involvement in the ultimate transaction quantitatively and qualitatively, and thus has significantly fewer and different responsibilities to the hiring client. Often, for example, the finder may accomplish work in as little as two phone calls (Minichiello v Royal Bus. Funds Corp., 18 NY2d 521, 527, cert denied 389 US 820). Here, Margolies and Dunton, as Northeast’s agents, did no more than introduce Sternau to Arpadi in accordance with the agreement. Indeed, the service was completed at that point under the agreement and by the ensuing conduct of the parties. Ultimately, the dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature "finder” or "broker” or even "agent,” but instead by the services agreed to under the contract between the parties. The dissent’s reliance on communications between the parties before they made their agreement is misplaced (dissenting opn, at 171). None of the duties the dissent would derive from those precontract discussions was incorporated into the formal contract, which defined the relationship as one solely involving a finder. Indeed, the parties have treated their relationship solely as one involving a finder throughout. The discussions of the parties prior to the contract should not be used now to enhance the written agreement. Nor does the record support the dissent’s contention that Dunton was unquestionably acting in a confidential role as investment banker and business counselor (dissenting opn, at 174). To the contrary, after the finder presented the prospect to the buyer, Arpadi explicitly rejected Dunton’s offer to participate further in the *164 transaction. A finder is not transformed into a broker or fiduciary because the finder is informed of the special needs of the client so the finder can perform the finder service.
We note, too, that while agents in New York are bound to exercise the utmost good faith toward their principals (Cristallina v Christie, Manson & Woods Intl., 117 AD2d 284, 292), the plaintiff finder in this case was also not an agent in the actual or functional meaning of that term and relationship. This finder had no explicit or implied power to bind Wellington. This finder did not have the power to negotiate the transaction. This finder did not have the power to do anything except find and introduce prospects; in fact, its offer to Wellington to participate further in the transaction after presenting a prospect was rejected by Wellington. Thus, by agreement and through the actions of the parties, this finder had no power to affect any legal relations of Wellington and the prospective buyer that would propel the duties into the fiduciary-like sphere.
This Court may sense a sympathetic impulse to balance what it may view as the equities of a situation such as this. The hard judicial obligation, however, is to be intellectually disciplined against that tug. Instead, courts must focus on the precise law function reposed in them in such circumstances, which is to construe and enforce the meaning and thrust of the contract of the parties, not to purify their efforts.
In Knauss v Gottfried Krueger Brewing Co. (142 NY 70), this Court analyzed a conflict of interest situation where a finder working for the seller of a brewery also took a commission from the buyer. This Court found no violation of a duty, because the character of the employment was not such as to require a duty. The path of disposition for this case is marked by parallel reasoning. The character of the Northeast-Wellington agreement was not one of trust importing duties beyond finding a prospect. The fact that Wellington did not employ its own independent, traditional methods to check out the reputation of the prospect and accepted what turned out to be a bad prospect does not warrant this Court rescuing it from its soured deal by any postagreement fiduciary lifeline.
If Wellington wanted fiduciary-like relationships or responsibilities, it could have bargained for and specified for them in the contract. We should emphasize that there is nothing inherently objectional about the "morals of the market place”. Once again, Chief Judge Cardozo offers illuminating instruction:
*165 "Some relations in life impose a duty to act in accordance with the customary morality and nothing more. In those the customary morality must be the standard for the judge” (Cardozo, The Nature of the Judicial Process, reprinted in Selected Writings of Benjamin Nathan Cardozo, at 152 [Margaret E. Hall ed 1947]).
They are an acceptable fact of life in a well-ordered, free society. This Court should not attempt to elevate all the mores of society to the standard of the "punctilio of an honor the most sensitive” (Meinhard v Salmon, 249 NY 458, 464, supra), where that is not justified, agreed to or expected. This Court, after all, is not the omniscient, great equalizer of the marketplace, with all its ups and downs, give and take, and varieties of conduct and relationships.
The commonplace mores of the marketplace suffice and are appropriate to govern relationships established by contract of the type involved here, which contemplates and asks nothing more of the parties than performance of a simple service. In sum, defendants’ financial losses from their market mishap with Sternau is not reason enough to propel a sweeping new fiduciary-like doctrine into finders’ agreements. Finally, the courts should not reform the agreed-upon finder relationship established by particular contract in this case.
We have considered the other arguments advanced by the parties and conclude that they are without merit and do not warrant further explication.
Accordingly, the order of the Appellate Division should be reversed, with costs, defendants’ motion to set aside the jury verdict denied, and case remitted to Supreme Court for further appropriate proceedings (see, 151 Misc 2d 389, 390, n, supra).