Jack KIRBY d/b/a USSA
Corp., Plaintiff,

v.

COASTAL SALES ASSOCIATION, INC.,
d/b/a Coordinated Strategic Alliances,
Inc., International Strategic Alliances,
Inc., and Retail Strategic Alliances,
Inc., Defendants.

No. 98 Civ. 8304 (CM)(MDF).

United States District Court,
S.D. New York.

Jan. 31, 2000.

Jonathan R. Nelson, Rae & Nelson LLP, New York, NY, for Plaintiff.

Robert A. Vort, Tenafly, NJ, David Feuereisen, Bartels & Feuereisen LLP, White Plains, NY, for Defendants.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

McMahon, District Judge.

Plaintiff Jack Kirby, doing business as USSA Corporation ("USSA"), asserts the following claims against Defendants Coastal Sales Association ("CSA"), International Strategic Alliances, Inc., and Retail Strategic Alliances, Inc.: (1) breach of a 1996 written contract between CSA and USSA; (2) breach of a 1995 oral contract between CSA and USSA; (3) declaratory judgment that the 1996 contract has not been terminated and remains in effect; and (4) declaratory judgment that the 1995 contract has not been terminated and remains in effect.

Kirby and Defendants have both moved for summary judgment both as to the case in its entirety, and in the alternative, as to particular Counterclaims and Affirmative Defenses discussed below. For the reasons that follow, Defendants' Motion is granted as to Plaintiff's First and Third Claims, and Plaintiff's Motion is granted with respect to Defendants' First, Second, and Third Counterclaims and claim for punitive damages, as well as Defendants' Third, Fourth, Fifth, Sixth, Seventh and Tenth Affirmative Defenses.

*Background*

This case arises out of the marketing of a compact folding chair known as the "What–A–Chair" by Plaintiff Kirby and his business associate, Lar Park–Lincoln. Kolon California Corporation ("Kolon California"), the manufacturer of the chair, approached Kirby sometime in 1994 with the idea of marketing the chair on the QVC network. In October 1994, Kolon California entered into a Product Representation Agreement ("the Kolon contract") with Reto, which appears to be a corporation of which Kirby was President, and Army Brat, Inc., another corporation, of which Park–Lincoln was President (although the copy of that contract provided in the record is signed only by Kirby). The Kolon contract gave Reto exclusive rights to sell the chairs to QVC. The contract also provided that Kolon California would pay Kirby and Park–Lincoln a commission of 10 percent of any sales of the "What–A–Chair" on QVC. CSA alleges that it was unaware of the existence of the Kolon contract when it negotiated its own contract with Kirby.

Meanwhile, in July 1994, Kirby and Park–Lincoln approached QVC directly about marketing the chairs on QVC. QVC suggested that they obtain an NFL license to enhance the marketability of the chairs by putting the NFL logo on them. Park–Lincoln contacted the NFL licensing department in August 1994, and received an encouraging response: the NFL recommended that she contact one of the NFL's current licensees and "piggyback" the marketing of the chairs on its license. Hence Plaintiff's involvement with Defendants. In September 1994, Kirby and Park–Lincoln approached Defendant CSA with the idea that CSA would apply for an NFL marketing license and allow them to "piggyback" on CSA's license, in return for which Kirby and Park–Lincoln would pay CSA a royalty. CSA, however, told Kirby and Park–Lincoln that CSA preferred to market the chair itself on QVC, and that it wanted Kirby and Park–Lincoln to receive a fixed royalty from CSA instead of Kolon.

The chronology of subsequent events is unclear, as neither party has identified the applicable dates. Apparently, at the same time CSA was negotiating with Kirby and Park–Lincoln, CSA (with Kirby's knowledge) was also negotiating to buy the chairs from Kolon California. To that end, CSA asked Kirby to introduce certain CSA

executives to the Kolon America Corporation, which, like Kolon California, is a separately-incorporated subsidiary of the Kolon Group, in the hopes that CSA might be able to negotiate a more favorable price from Kolon America than that offered by Kolon California. That approach was ultimately unsuccessful, and CSA resumed its negotiations with Kolon California. On February 24, 1995, however, after CSA had made contact with Kolon America, Kolon America sent Kirby a fax offering to pay Reto a two percent commission on any dealings that Kolon America had with CSA. Kirby avers that he neither signed the document nor responded to it, nor did he ever receive any form of payment from Kolon America. CSA offers no proof to the contrary.

Meanwhile, CSA made an oral offer (exactly which CSA officer made the offer is unclear) to pay Kirby and Park–Lincoln $1.40 per chair sold, intended to represent 10 percent of CSA's wholesale price to QVC of approximately $14. On April 24, 1995, Kirby received a fax from Ed Tesher, CSA's Vice President, informing Kirby that CSA needed Kolon California's confirmation that the agreed-upon price for chairs was "$10.50 net, net, landed, per chair." He went on to note that "We also need to confirm the agreement between Lar and yourself as to build in for pricing." The terms of the oral agreement were memorialized in a letter from Park–Lincoln to Tesher dated May 19, 1995, which states that the royalty commissions were "payable to Jack [Kirby] and I," but goes on to state that the total commission was to be "divided equally between the following two corporations," which Park–Lincoln identified as USSA and Army Brat. Defendants do not dispute that an oral agreement had been reached by that point; however, neither Tesher nor any other officer of CSA signed the May 19 letter. After receiving a commitment from CSA, Kirby and Park–Lincoln assert that they terminated their contract with Kolon California—which Kirby states he carried out by drawing a line drawn through the agreement's operative terms—and thereby gave up their rights to receive royalties for the chairs from Kolon.

Kirby's involvement with Kolon, however, did not end. Kolon continued to manufacture the chairs for CSA, and when quality control problems arose in 1995, Kirby traveled to China in October 1995 to inspect the production of chairs at a Kolon factory there. Kirby split the cost of the trip with Park–Lincoln, and was never reimbursed by CSA. Moreover, as part of an effort to procure a deal between Kolon and CSA, Kirby persuaded Kolon to grant CSA a $100,000 credit line.

The What-A-Chair evidently sold well on QVC. In February 1996, Tesher sent a letter to Park–Lincoln seeking agreement from her and Kirby to the terms of a new contract, including the reduction by half of the royalties payable to them. Tesher implied that it was in their interest to assent, writing:

> We are asking for your support to help us go long term. What we need is a royalty to exist of $.35 each to you and Jack [Kirby] and then we can afford to go forward in royalty for our new products. (Pl.Exh. 9.)

Kirby claims that he, Park–Lincoln, and CSA had discussed the possibility of extending the product's life cycle by developing new product lines, for example, selling the chair with the logo of the NFL or individual NFL teams. The offer was repeated in a follow-up e-mail sent by Eric Levine, CSA's President, to Park–Lincoln in March 1996. On May 19, 1996, Kirby, as President of USSA, and Levine, as President of CSA, signed the Royalty Agreement ("the 1996 agreement"), which provides that "First Party [named in the contract as CSA] markets a product sold under the trade name What A Chair, What An Ottoman, and The Double Chair, as well as any new chairs (First Party's Product)." (1996 agreement ¶ 1.) Kirby argues that the "any new chairs" language in this provision obligates CSA to pay him a roy-

alty on sales of all seating products developed by CSA from the original What–A–Chair design.

Paragraph 8 of the agreement provides that royalties were to be paid in the following amounts: What–A–Chair, at $.35 per unit; What–An–Ottoman, at $.30 per unit; and Double What–A–Chair, at $.45 per unit. The contract also provides that the initial term of the agreement as amended would run from March 1, 1996 to December 31, 1996, and was renewable thereafter upon 60 days notice prior to the end of the "Initial Term" or any "renewal term." The agreement further states that it "shall be construed and enforced in accordance with the laws of the state of New York."

On November 11, 1998, Defendants gave Kirby written notice of termination; Kirby denies that this notice was effective on the basis that Defendants failed to provide the 60 days notice as called for under the contract. He claims that Defendants have breached the agreement by: (1) paying smaller royalties per unit than called for under the agreement; (2) recalculating and adjusting downward royalties previously paid in accordance with the agreement; (3) failing to provide timely information about sales; (4) paying on less than the total number of units sold; (5) making delinquent payments; (6) failing to account for arbitrary reserves for "returns"; (7) failing to pay royalties for certain classes of chairs; and (8) failing to include the sales of Defendants International Strategic Alliances, Inc. and Retail Strategic Alliances, Inc. Kirby alleges damages in the amount of $275,000.

Defendants have brought a number of Counterclaims seeking return of all moneys paid to Kirby under the 1995 and 1996 contracts. The claims they have designated in the Joint Pretrial Order do not include all of the claims raised in their briefs, but taken together, they include: (1) fraud-in-the-inducement based on Kirby's failure to disclose that he was employed by Kolon, that he had a pre-existing agreement to collect commissions from Ko-lon for sales of the What–A–Chair, and that he had a second agreement with Kolon America for payment of a commission in exchange for all orders placed by CSA with Kolon America; (2) breach of fiduciary duty based on the same non-disclosure; and (3) fraudulent inducement based on Park–Lincoln's alleged misrepresentation that the What–A–Chair's design was patented. They have also raised a number of Affirmative Defenses that are discussed below.

### Standard for Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment on Kirby's Complaint. Each of his Claims is discussed in turn:

#### (1) First Claim—Breach of 1996 Contract

Defendants first argue that no valid contract was formed between CSA and USSA or Kirby in 1996, because USSA lacked capacity to contract. It is undisputed that USSA's corporate charter was suspended at the time Kirby signed the agreement.

Defendants have produced a Westlaw printout of a Dun & Bradstreet Report indicating that USSA's charter was suspended by the California Franchise Tax Board on July 1, 1988, that the corporation was decertified by the California Secretary of State on June 7, 1988, and that a Secretary of State Suspension occurred on May 17, 1988. (Attached as Exhibit B to Declaration of Robert A. Vort.) There is no mention of any reinstatement or re-certification in that Report. Kirby's counsel acknowledged at oral argument that the corporation was not in good standing in California, and he has not contradicted CSA's evidence demonstrating that USSA was not in good standing when the 1996 agreement was signed.

■ Under California law, a corporation whose charter has been suspended for delinquent license tax payments lacks the capacity to enter into contracts. *See Van Landingham v. United Tuna Packers,* 189 Cal. 353, 208 P. 973, 976 (1922). Any contract made by the corporation while its charter is in suspension is voidable "at the instance of any party to the contract other than the taxpayer." *See* California Bank and Corporation Tax Law § 23304.1(a). While the agreement states that New York law governs its enforceability, New York cannot fail to accord full faith and credit to the limitations on corporate capacity imposed by California law on a California corporation. *See* U.S. Const. art. IV, § 1; 36 Am.Jur.2d *Foreign Corporations* § 88 (1968) ("other states in which the rights, powers, duties, or liabilities of the corporation are called into question are required by the Federal Constitution to give full faith and credit to ... laws of the state of origin in determining the powers of the corporation"). Thus, it would appear that the First Claim for Relief must be dismissed.

■ Kirby responds that, even if USSA lacked capacity to contract, he has standing to enforce the contract in his individual capacity. Indeed, he goes further: he claims that he, not USSA, was the actual contraparty to the 1996 agreement. Kirby has no choice but to make this argument. Under New York law, where a party to a contract signs the document only in his capacity as corporate officer, he may not maintain an action on the contract in his individual capacity. *See General Motors Acceptance Corp. v. Kalkstein,* 101 A.D.2d 102, 474 N.Y.S.2d 493, 495 (N.Y.App.Div. 1st Dept.1984).

Here, the preamble of the contract states that the Agreement is made between CSA, Inc. and USSA Corp. Below Kirby's signature appears the title "Jack Kirby, President." Nonetheless, Kirby asks the Court to infer that he entered the contract personally—or at least to conclude that the matter is ambiguous and not susceptible to summary judgment—because (1) the legend above his signature line says "Jack Kirby" and not "USSA Corp.," and (2) the first royalty check disbursed under the contract was made out to "Jack Kirby" and not to the corporation.

■ However, neither of these facts raises any issue concerning who entered into the 1996 contract. As the individual known as Jack Kirby did indeed sign the contract—albeit in his capacity as the president of a corporation that is identified as the party to the contract—no reasonable juror could conclude from the face of the document that Kirby was the party rather than USSA. The fact that his name appears above the signature line does not raise a genuine issue of fact in the face of the clear statement in the preamble to the Agreement and the fact that his signature line is legended "President." And while CSA did indeed issue the first check to Kirby individually, he himself negates any inference one might draw from that fact by admitting that he directed CSA to make all subsequent checks payable to the corporation. (Cplt.¶ 26.) Thus, the factors cited by Kirby do not indicate that CSA "knew" that it was contracting with Kirby rather

than the corporation.[1] Therefore, Kirby lacks standing to bring an action on the 1996 contract.

Because USSA had no capacity to contract when the 1996 agreement was signed, and Kirby was not a party thereto, I find that the contract is voidable. CSA has clearly indicated its desire to avoid the contract, both by terminating it and by asserting the defense of lack of capacity in this lawsuit. Kirby's First Claim is therefore dismissed.

At and after oral argument, Kirby's attorney has suggested that this action (which his client commenced) be abated so that Kirby can return USSA to good corporate standing under California law. This request is denied. Kirby elected to take his chances by commencing an action on a voidable contract when his corporation lacked legal status. He has burdened this Court and the Defendants by maintaining the action for nearly a year and a half, subjecting both the Court and CSA to massive discovery (with concomitant discovery disputes) and extensive motion practice. Now is not the time to put his corporate affairs in order. He should have done so prior to commencing this action—especially since he can hardly claim to be ignorant of his peril (see discussion under Part 2, below). This Court does not appreciate being asked to jump through hoops unnecessarily.

### (2) Second Claim—Breach of 1995 Contract

In his Complaint, Kirby anticipated that I might hold the 1996 contract to be unenforceable. He therefore brought an alternative cause of action for breach of the 1995 oral agreement, which he contends is still extant if it was never replaced by the 1996 agreement.

There is an issue of corporate capacity here, too, since a suspended corporation cannot make any contract, written or oral. However, the record does not clearly reveal with whom the 1995 contract was made—Kirby or USSA. If the latter, then the 1995 agreement is as voidable as the 1996 written one; if with Kirby, then the agreement exists and is enforceable.

■ The Court is unable to resolve the question of who made the 1995 deal because the record is ambiguous. Kirby's counsel conceded at oral argument that his client had been doing business under the name USSA Corporation since 1994. This strongly suggests that the 1995 agreement, like its 1996 counterpart, was made between CSA and USSA. But in a letter dated April 24, 1995 from Tesher to Kirby, Tesher refers to the need "to confirm the agreement between Lar and yourself as to build in for pricing," which might be seen to suggest that Kirby individually was the contracting party. The May 19, 1995 letter from Park–Lincoln to Tesher, which memorialized the terms of the oral agreement, supports both points of view: it indicates that USSA and Park–Lincoln's corporation, Army Brat, Inc., were to receive payment, but also states that the proceeds were payable to Kirby and Park–Lincoln individually. It is, therefore, necessary to hold a trial in order to determine who made the 1995 contract: Kirby or USSA.

Defendants have moved for dismissal of this claim on the ground that Kirby lacks capacity to maintain an action on the oral agreement. They note, correctly, that he was doing business under the name USSA Corporation for some years—something Kirby's counsel readily admitted at oral argument. Defendants then argue that

---

1. There is no information in the record as to whether USSA was a Subchapter S corporation, but this would appear not to alter the outcome. In the context of shareholder derivative suits, California courts have recognized that where an alleged wrong has been suffered only by the corporation, an individual shareholder has no standing to sue, regardless of the corporation's Subchapter S status, on the rationale that the corporation is nonetheless a separate entity. *See Eisenberg v. Hughes*, No. C 97–2466, 1999 WL 459358, *6 (N.D. Cal. June 25, 1999) (citation omitted).

Kirby is precluded from bringing this action under California Business and Professions Code § 17918, which bars a person transacting business under a fictitious name from maintaining an action on any contract made in that fictitious name, until that person duly files a fictitious name statement. Kirby admittedly did not file a fictitious name statement in California until at or about the time he commenced this lawsuit.

There are two problems with Defendants' argument. The first is that Kirby can only prevail on this claim if he is able to convince a jury that he, not USSA, was the contraparty to the 1995 oral agreement (since, if USSA was the party, the suspension of its charter meant that the purported oral agreement with it is also voidable). If Kirby prevails on that contention, then he will not be maintaining the action "on any contract made in that fictitious name," and therefore, he will not fall within the literal terms of the statute.

█ The second problem is that the prohibition on maintaining an action imposed by Business and Professions Code § 17918 deals only with one's capacity to resort to the courts, not one's capacity to create an enforceable right. The bar to suit disappears once the fictitious name certificate is filed; unlike the suspension of a corporate charter, failure to file such a certificate does not preclude corporate capacity to contract or render an agreement voidable, as does Bank and Corporation Tax Law § 23304.1(a). By filing his certificate Kirby eliminated the bar to maintaining suit. He did not, however, eliminate the problem that will arise if the jury finds that USSA, not Kirby himself, made the 1995 oral agreement. That problem, because it touches on the corporation's capacity to enter into any contract at all, cannot be fixed by a belated filing under § 17918.

Defendants also seek dismissal of this claim on the ground that, in order to induce CSA to enter into the 1995 agreement, Kirby "fraudulently misrepresented and concealed the fact that he was employed by Kolon as its representative at that time." (Ans. ¶ 18.) They base this defense on Kirby's alleged failure to disclose the existence of two contracts that Defendants assert to have been in effect between Kolon and Kirby at the time CSA contracted with Kirby: the October 1994 Product Representation Agreement between Reto (another Kirby corporation) and Kolon California, and the alleged agreement by Kolon America to pay Reto two percent commissions on dealings between Kolon and CSA. Defendants state that they would not have contracted with Kirby—in the event this Court finds that a valid contract was formed—had they so known.

Insofar as Defendants rely on the alleged agreement with Kolon America, this defense has no merit. Defendants, despite months of discovery, have not offered this Court a scintilla of evidence to support their contention that Kirby actually entered into any such arrangement. In particular, they offer no evidence to counter Kirby's assertion that he never accepted a dime from Kolon America—an assertion that negates any inference that he accepted Kolon America's offer to enter into a business arrangement with him.

As for the 1994 Product Representation Agreement with Kolon California, Kirby avers that he terminated that contract when he and Park–Lincoln reached agreement with CSA on the terms of the 1995 oral contract. That agreement does not provide a termination date, but allows Kolon to terminate the contract on 30 days notice if Kirby or Park–Lincoln should fail to secure any sales after one year. The agreement is silent as to how it may be terminated by Kirby and Park–Lincoln. Kirby claims that he terminated the Kolon agreement by drawing lines through its operative terms. Defendants argue that this act is insufficient as a matter of law to effect termination of a contract, but fail to cite me to any applicable California law,

which controls the interpretation of the Kolon agreement.

 The 1994 Kolon agreement does, however, seem to fall within the ambit of California Civil Code § 1700, which provides:

> The intentional destruction, cancellation, or material alteration of a written contract, by a party entitled to any benefit under it, or with his consent, extinguishes all the executory obligations of the contract in his favor, against parties who do not consent to the act.

Under California law, then, mutilation of a contract by one of the parties to the contract does not result in the contract's termination, but rather, eliminates the mutilating party's entitlement to performance by the other party. Thus, Kirby's act is not dispositive of the question of termination. However, the mutilation of the contract document (which is not contested) is evidence tending to show that Kirby intended for his arrangement with Kolon California to end.

As additional support for his assertion that the Kolon agreement was terminated, Kirby avers that (1) he never received any further payments from Kolon after he contracted with CSA, and (2) CSA would have been unable to negotiate the price of $9.65 per chair that it paid to Kolon California if Kolon had still been obligated to pay Kirby commissions, because CSA would have had to pay an additional ten percent to Kolon to cover the commissions. These factors—especially the cessation of commission payments—strongly suggest that Kirby did indeed terminate the contract. CSA has not disputed Kirby's assertions. In the face of this undisputed evidence, no reasonable juror could draw any inference other than that the 1994 Product Representation Agreement was terminated in favor of the oral contract with CSA.

As a fallback position, Kirby argues that CSA was aware of his Agreement with Kolon at the time he and Park–Lincoln entered into the 1995 agreement with CSA, as evidenced by a letter from Park–Lincoln to Tesher dated September 28, 1994, informing Tesher that "Jack [Kirby] and I are splitting a 10% commission on these chairs." Although that letter makes no specific mention of Kolon, Kirby reasons that CSA must have realized that the commission was being paid by the manufacturer of the chairs, which was Kolon.

 At a minimum, the letter demonstrates that CSA was aware that Kolon was the manufacturer (as it was engaged in negotiations with Kolon for sale of the chairs) and that Kirby was receiving a commission from someone. This gave rise to a duty on CSA's part to make some further inquiry about the particulars of this commission. Where "the facts which are the subject of the alleged misrepresentation are not exclusively within the [aggrieved party's] knowledge and [that party] could have readily ascertained the truth regarding those facts, the burden is on the latter to make the relevant inquiries ... or he [or she] will not be heard to complain that he [or she] was induced to enter into the transaction by misrepresentations." *Dero v. Gardner,* 700 N.Y.S.2d 507, 508–09 (N.Y.App.Div.3d Dept.1999) (quotations omitted). *C.f. IFD Constr. Corp. v. Corddry Carpenter Dietz and Zack,* 253 A.D.2d 89, 685 N.Y.S.2d 670, 673 (N.Y.App.Div. 1st Dept.1999) (no negligent misrepresentation claim where a party had means to discover true nature of transaction "by the exercise of ordinary intelligence") (quotations omitted). Here, CSA was undisputedly aware of facts that were more than sufficient to put it on notice of the likelihood that Kirby had been receiving commissions from Kolon California pursuant to a contract, and could easily have ascertained the legal nature of Kirby's relationship with Kolon before contracting with him. CSA's failure to inquire thus provides an additional ground for denying Defendants' motion for summary judgment on the basis of fraudulent inducement by Kirby.

Additionally, Defendants seek summary judgment based on fraudulent inducement arising from another alleged misrepresentation. Specifically, they allege that Park–Lincoln fraudulently represented to CSA that the What–A–Chair design was patented by giving Tesher a promotional brochure for another chair known as the "Bottom–Bumper Insta–Chair," and that Kirby defrauded CSA by remaining silent despite his knowledge of Park–Lincoln's misrepresentation.

Defendants claim that the brochure passed along by Park–Lincoln represented the "Bottom–Bumper" chair's design as patented. Their fraud allegation appears to rest on the premise that the Bottom–Bumper and the What–A–Chair share the same design, but they have failed to provide any evidence so showing. Defendants' only evidence of a fraudulent misrepresentation of patent protection by Park–Lincoln or Kirby consists of: (1) Tesher's averment that Park–Lincoln told Tesher and Levine that "the product" was patented (Tesher Aff. ¶ 9); (2) Kirby's testimony that Park–Lincoln prepared a brochure for the Bottom–Bumper chair, and that he knew that the Bottom–Bumper was in fact not patented (Kirby Dep. at 120–21); and (3) a fax cover sheet from Kirby to "Ed or Eric" dated only as "7/5," with no year specified, which identified as the subject of the fax the "Kolon & Towpak patent," and listed four "Points to Cover" that have no apparent connection to any patent (attached as Exhibit F to Vort Declaration).[2] The Bottom–Bumper brochure neither makes reference to the What–A–Chair nor gives any indication (other than the designation of Kirby and Park–Lincoln as contacts) that the two chairs are in any way related (attached as Exhibit A to Declaration of Ed Tesher). Indeed, on this record it is impossible to understand what the relationship is between the Bottom–Bumpers and the What–A–Chairs, or why the former's patent status was relevant to CSA's decision to do business with Kirby. The fax cover sheet does nothing to even suggest a misrepresentation by Kirby that the What–A–Chair was protected by a patent, and the non-specific statement in Tesher's affidavit is insufficient to avoid summary judgment.

Finally, Defendants assert that Kirby lacks capacity to bring this claim (assuming that it is his claim to bring, and not the corporation's), in that USSA has not obtained a license to transact business in the State of New York as required under Section 1312(a) of the New York Business Corporation Law. Because I have determined that only Kirby as an individual, and not USSA, has standing to bring this action, the defense of Section 1312(a) is inapposite.

Because of the Court's inability to determine who the contracting party was on the 1995 oral agreement, summary judgment on Kirby's Second Claim is denied.

### (3) Third Claim—Declaratory Judgment That the 1996 Agreement Remains in Effect

Since the parties' 1996 contract is voidable, this claim must be dismissed.

### (4) Fourth Claim—Declaratory Judgment That the 1995 Agreement Remains in Effect

The viability of this Claim depends upon whether Kirby can maintain his Second Claim. Even if Kirby is able to prove that he, and not his corporation, was the contraparty to the 1995 contract, he may not be able to extend the reach of that agreement to the time period following his new deal made in 1996 and now voided. Unfortunately, the parties have not begun to

---

2. Below the names of the sender and addressee, the cover sheet reads as follows:
 Points to Cover:
 1. Quality control at QVC
 2. CSA credibility at QVC
 3. Total man hours & travel cost to revamp shipments. Men to come from CSA to inspect.
 4. Payment schedual [sic] and chairs needed for the remaining year.

brief this complicated issue; it certainly cannot be resolved on the record presently before me.

*Defendants' Counterclaims*

### (1) First Counterclaim—Fraudulent Inducement

Defendants have asserted a Counterclaim for fraudulent inducement to contract based on the same allegations they raised in their Motion for Summary Judgment—i.e., Kirby's failure to disclose his contractual relationship with Kolon and Park–Lincoln's alleged misrepresentation that the What–A–Chair was patented. Both Kirby and Defendants have moved for summary judgment on this Counterclaim. As discussed above, Defendants have come forward with no evidence whatsoever that Kirby's 1994 contract with Kolon California was in effect at the time CSA contracted with USSA or that Kirby or Park–Lincoln made any fraudulent misrepresentations as to the existence of a patent for the What–A–Chair. Furthermore, Defendants failed to investigate the Kolon contract despite the fact that CSA was on inquiry notice of that contract's existence. Defendants' First Counterclaim is therefore dismissed.

### (2) Second Counterclaim—Lack of Consideration

Defendants next bring a Counterclaim for unjust enrichment on the ground that the 1995 and 1996 agreements are unsupported by consideration and thus unenforceable. Of course, I need not reach this claim with respect to the 1996 agreement, as I have already found that the 1996 agreement has been voided.

Kirby argues that the relinquishment of his right to receive commissions under the 1994 Kolon agreement constituted legal detriment and therefore provided consideration for the 1995 oral agreement with CSA. As discussed above, Defendants have failed to raise a question of fact as to whether the Kolon agreement remained in effect when CSA entered into the 1995 agreement with Kirby, and thus, there is no basis upon which to conclude that the termination of the Kolon agreement did not supply consideration for the 1995 agreement. Accordingly, Defendants' Second Counterclaim is dismissed.

### (3) Third Counterclaim—Fraudulent Inducement

It is unclear from Defendants' pleading how this Counterclaim differs from their First. The Third Counterclaim alleges that Kirby fraudulently led CSA to believe that Kirby represented USSA rather than Kolon. To the extent that this claim is based upon the existence of a Kolon contract binding Kirby at the same time Kirby contracted with CSA, it is duplicative of the First Counterclaim and must meet with the same fate.

In their opposition papers, Defendants state that their Counterclaims are further based on a breach of fiduciary duty theory—i.e., that Kirby, as an agent of both Kolon and CSA, impermissibly served two masters. While it is true that an agent owes a fiduciary duty to his principal, Defendants have failed to show that an agency relationship was formed between CSA and Kirby by virtue of their agreement to pay royalties to Kirby or USSA. The agreement did not confer on Kirby or USSA any express or implied power to bind CSA. And of course, parties to a contract, without more, are not fiduciaries. *See Northeast Gen. Corp. v. Wellington Advertising, Inc.*, 82 N.Y.2d 158, 164–65, 604 N.Y.S.2d 1, 624 N.E.2d 129 (N.Y.1993). Defendants' breach of fiduciary duty claim therefore fails as a matter of law, and their Third Counterclaim is dismissed.

### (4) Defendants' Claim for Punitive Damages

As all of their Counterclaims are dismissed, Defendants no longer have a basis for punitive damages. This claim is dismissed.

*Kirby's Motion to Strike Defendants' Affirmative Defenses*

In addition to his Motion for Summary Judgment on Defendants' Counterclaims, Kirby has moved to strike Defendants' Third, Fourth, Fifth, Sixth, Seventh, and Tenth Affirmative Defenses.

*(1) Third Affirmative Defense—Failure to Secure License to Do Business in New York*

As discussed above, because Kirby has standing to bring this action only as an individual, the licensing requirement of New York CPLR § 1312(a) does not apply to this action. Defendants' Third Affirmative Defense is therefore stricken.

*(2) Fourth Affirmative Defense—1995 Agreement Void under N.Y.G.O.L. § 15–701*

Defendants originally raised the affirmative defense that New York General Obligations Law § 15–701, which deals with the non-discharge of a surety by failure or refusal of a creditor to sue the principal debtor, rendered the 1995 oral agreement void. Defendants abandoned this defense in the parties' Joint Pre–Trial Order. Their Fourth Affirmative Defense is therefore stricken.

*(3) Fifth Affirmative Defense—1995 Agreement Void under N.Y.G.O.L. § 5–701*

In their Answer, Defendants also asserted the defense that this action is barred by the Statute of Frauds under General Obligations Law § 5–701. They have likewise abandoned this defense in the Pretrial Order. Accordingly, it is dismissed.

*(4) Sixth Affirmative Defense—Lack of Consideration*

As in their Motion for Summary Judgment, Defendants allege that the 1995 and 1996 agreements are unenforceable for lack of consideration. For the reasons discussed above in connection with Defendants' Second Counterclaim, Kirby's motion to strike this defense, insofar as it applies to the 1995 agreement, is granted.

*(5) Seventh Affirmative Defense—Fraudulent Inducement*

For the reasons discussed above in connection with Defendants' Motion for Summary Judgment and Counterclaims for fraudulent inducement, Kirby's motion to strike this defense is granted. Defendants' Seventh Affirmative Defense is thus dismissed.

*(6) Tenth Affirmative Defense—Failure to Satisfy Conditions Precedent*

Defendants' Tenth Affirmative Defense alleges that Kirby failed to satisfy what Defendants describe as "conditions precedent" to CSA's obligation to pay Kirby under the agreements. Specifically, they assert that Kirby was obligated to secure alternative sources at an unspecified point in time when chairs manufactured by Kolon were found to be defective.

As Kirby correctly responds, the Royalty Agreement contains no provision that can be interpreted as a condition precedent, an argument that Defendants appear not to dispute, as they did not address this point in their opposition papers. This defense is therefore stricken.

For the foregoing reasons, Kirby's First and Third Claims are dismissed, as are Defendants First, Second, and Third Counterclaims and claim for punitive damages. Summary judgment is denied on Kirby's Second and Fourth Claims. Defendants' Third, Fourth, Fifth, Sixth, Seventh, and Tenth Affirmative Defenses are stricken.

This constitutes the order and decision of the Court.