## CALVIN KLEIN TRADEMARK TRUST and Calvin Klein, Inc., Plaintiffs,

v.

## Linda WACHNER, the Warnaco Group, Inc., Warnaco Inc., Designer Holdings Ltd., CKJ Holdings, Inc., Jeanswear Holdings, Inc., Calvin Klein Jeanswear Company and Outlet Holdings, Inc., Defendants.

### No. 00 Civ. 4052 (JSR).

United States District Court, S.D. New York.

Dec. 5, 2000.

---

Jonathan Schiller, Andrew Hayes, New York City, for plaintiff.

Kevin T. Baine, Gregory Craig, Washington D.C., for defendant.

## MEMORANDUM

RAKOFF, District Judge.

By order dated August 29, 2000 the Court granted those portions of defendants' then-pending motion under Rules 12(b)(6) and 12(f), Fed.R.Civ.P. that sought dismissal in their entirety of Counts Four, Five, and Sixteen of plaintiffs' Complaint and that sought as to Count Eight of the Complaint dismissal of defendants Linda Wachner and The Warnaco Group, Inc. and a stay pending arbitration as to defendant Warnaco, Inc.[1] This Memorandum explains the reasons for these rulings.

---

1. The Court decided the other portions of defendants' motion from the bench at the time of oral argument on August 3, 2000. *See* transcript.

The somewhat complicated contractual relations between the parties chiefly derive from a series of agreements they entered into on March 14, 1994 (the "March 1994 Agreements") that were designed to apportion between them the rights to exploit various Calvin Klein trademarks.[2] First, plaintiff Calvin Klein, Inc. ("CKI") entered into a "Trust Agreement" with the Wilmington Trust Company that established the Calvin Klein Trademark Trust ("CK Trust"), which is co-plaintiff here. The Trust Agreement was also "Accepted and Agreed to" by defendant Linda Wachner in her capacity as principal officer of one of the companies used to effectuate some of the transfers undertaken pursuant to the March 1994 Agreements. Pursuant to a "World Wide Transfer Agreement," CKI then conveyed the trademarks "Calvin Klein," "CK/Calvin Klein," "CK/Calvin Klein Jeans," and "CK" (collectively the "Marks") to the CK Trust in return for three ownership certificates: a Class B certificate representing use of the Marks on and in connection with women's intimate apparel, a class C certificate representing use of the Marks on and in connection with men's underwear, and a Class A certificate representing use of the Marks on and in connection with all other products. Under an "Acquisition Agreement" between CKI and defendants The Warnaco Group, Inc. ("Warnaco Group") and its subsidiary Warnaco, Inc. ("Warnaco"), CKI then sold the Class B and Class C certificates to Warnaco for $58,500,000. Additionally, under a "Men's Accessories License Agreement," CKI gave Warnaco an exclusive license to use the Marks on and in connection with the manufacture, distribution, and marketing of men's belts and accessories. CKI, the CK Trust, and Warnaco also entered into a "Quality Assurance Agreement" to help maintain the value of the Marks and an "Administration Agreement" to provide for the administration of the other March 1994 Agreements.

Thereafter, on August 4, 1994, CKI entered into a "Jeanswear License Agreement" with defendant Calvin Klein Jeanswear Co. ("Calvin Klein Jeanswear"), a subsidiary of defendant Designer Holdings, Inc., ("Designer Holdings") giving Calvin Klein Jeanswear an exclusive license to sell jeans and jean-related items bearing one or more of the Marks. Further, on October 31, 1996, CKI entered into a "Store License Agreement" with defendant Outlet Holdings, Inc. ("Outlet Holdings"), an affiliate of Calvin Klein Jeanswear, giving Outlet Holdings the right to maintain and operate "Calvin Klein Outlet Stores" as long as the Jeanswear License Agreement remained in effect. Finally, in late 1997, Warnaco Group acquired Designer Holdings and thereby obtained the right to act as licensee under both the Jeanswear License Agreement and the Store License Agreement.

*Count Four* of the Complaint premises that by virtue of these various agreements defendants Warnaco, Warnaco Group, and Linda Wachner (principal officer of various of the defendants) owe fiduciary duties to plaintiffs CKI and the CK Trust, which these defendants allegedly breached through bad business practices, material misrepresentations, and fraud. *See* Complaint, ¶¶ 127–141. In fact, however, none of these agreements, singly or in tandem, imposes upon these defendants anything more than ordinary contractual duties, and hence Count Four must be dismissed.

■ Most of the agreements here in issue, such as the licensing agreements, are governed by New York law. *See* Men's Accessories License Agreement, § 18.7; Jeanswear License Agreement, § 14.7; Store License Agreement, § 16(g). Under New York law, parties to a commercial contract do not ordinarily bear a

---

**2.** All the contracts referred to in this Memorandum are effectively incorporated by reference in plaintiffs' Complaint and thus may be considered on a motion under Rule 12(b)(6).

*See, e.g., International Audiotext Network v. American Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995).

fiduciary relationship to one another unless they specifically so agree. *See, e.g., Northeast Gen. Corp. v. Wellington Adver., Inc.,* 82 N.Y.2d 158, 160–65, 604 N.Y.S.2d 1, 624 N.E.2d 129 (1993); *see also Mia Shoes, Inc. v. Republic Factors Corp.,* 1997 WL 525401, at *2 (S.D.N.Y. Aug.21, 1997) (applying New York law). This is as true in the case of a licensing agreement as in any other case. *See, e.g., Surge Licensing, Inc. v. Copyright Promotions Limited,* 258 A.D.2d 257, 685 N.Y.S.2d 175, 176 (1st Dep't, 1999).

In certain limited and unusual circumstances there may be special factors that create fiduciary relationships between contracting commercial parties, such as, for example, when one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party. *See, e.g., Feigen v. Advance Capital Management Corp.,* 150 A.D.2d 281, 541 N.Y.S.2d 797, 799 (1st Dep't, 1989); *ADT Operations v. Chase Manhattan Bank, N.A.,* 173 Misc.2d 959, 662 N.Y.S.2d 190, 192 (N.Y.Sup.Ct., New York County, 1997); *BBS Power Mod, Inc. v. Prestolite Electric, Inc.,* 71 F.Supp.2d 194, 203 (W.D.N.Y.1999) (applying New York law). But nothing of that sort is here alleged, nor, given the size and sophistication of the contracting parties, could it be.

■ Rather, so far as the New York contracts are concerned, plaintiffs rely on largely conclusory allegations that in entering into the March 1994 Agreements the parties intended to establish a "close working relationship" that, by its very nature, would involve obligations of mutual trust. *See, e.g.,* Complaint ¶¶ 22, 132. Under New York law, however, "[a] conventional business relationship, without more, does not become a fiduciary relationship by mere allegation." *Oursler v. Women's Interart Ctr., Inc.,* 170 A.D.2d 407, 566 N.Y.S.2d 295, 297 (1st Dep't, 1991). Nor can allegations of subjective intent substitute for an absence of objective manifestation of fiduciary obligation in the contracts in question. *See, e.g., Northeast Gen. Corp.,* 82 N.Y.2d at 162, 604 N.Y.S.2d 1, 624 N.E.2d 129.

■ Plaintiffs' fallback position is to seek a basis for defendants' alleged fiduciary obligations under Delaware law, and specifically under the Delaware Business Trust Act, Del.Code. Ann. tit. 12, § 3801 *et seq.* (1974 & Supp.1999), which governs the Trust Agreement.

However, unlike an ordinary property trust that is instinct with fiduciary obligation, a "business trust" is simply an alternative form of business organization, *see generally Morrissey v. Commissioner of Internal Revenue,* 296 U.S. 344, 357, 56 S.Ct. 289, 80 L.Ed. 263 (1935), designed, especially in Delaware, to give sophisticated commercial parties unusual flexibility in structuring their ventures, *see* R. Franklin Balotti and Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations,* § 25.1. Moreover, none of the defendants here is named as a trustee under the Trust Agreement. Rather, the Trust Agreement treats the transferees of the Class A, Class B, and Class C Certificates—CKI and Warnaco—as beneficial owners of the their respective portions of the corpus of the CK Trust. But no provision of the Delaware Business Trust Act provides that beneficial owners of a Delaware business trust have fiduciary obligations to each other.

Plaintiffs, however, contend that a beneficial owner of a Delaware business trust who has some power (as the beneficial owners here arguably did) to give directions to the trustee assumes thereby some of the fiduciary responsibilities of a trustee. They support this argument chiefly by reference to § 3806(a) of the Delaware Business Trust Act, which reads as follows:

Except to the extent otherwise provided in the governing instrument of a business trust, the business and affairs of a business trust shall be managed by or

under the direction of its trustees. To the extent provided in the governing instrument of a business trust, any person (including a beneficial owner) shall be entitled to direct the trustees or other persons in the management of a business trust. Except to the extent otherwise provided in the governing instrument of a business trust, neither the power to give direction to a trustee or other persons nor the exercise thereof by any person (including a beneficial owner) shall cause such person to be a trustee. To the extent provided in the governing instrument of a business trust, neither the power to give direction to a trustee or other person nor the exercise thereof by any person (including a beneficial owner) shall cause such person to have duties (including fiduciary duties) or liabilities relating thereto to the business trust or to a beneficial owner thereof.

Del.Code Ann. tit. 12, § 3806(a) (1974 & Supp.1999). Plaintiffs argue that the last sentence of § 3806(a) implies that *but for* a disclaimer in the governing instrument of a business trust, a beneficial owner with power to give direction to the trustee of the trust has fiduciary duties to other beneficial owners. This, however, is hardly the only logical reading: for example, the last sentence might simply confer on the parties the ability, if they wanted to exercise it, to negate conclusively any future risk that a court might someday seek to impose on the parties special legal duties or liabilities (not necessarily of a fiduciary nature) where none were intended.

Put another way, the central difficulty with plaintiffs' argument as that it assumes the point in controversy, *i.e.,* the existence of a default rule that imposes fiduciary duties on beneficial owners of a Delaware business trust, at least where they exercise some directive authority. While, as plaintiffs contend, the last sen-

tence of § 3806(a) does not negate the possible existence of such a default rule, neither does it affirm it: rather, it is simply silent on the matter. Without more explicit authority under Delaware law, the Court will not presume to find through silent implication an affirmation in § 3806(a) of anything as substantial as the imposition of reciprocal fiduciary duties on these arms' length commercial parties simply because they made use of the convenient device of a Delaware business trust to apportion use of the Marks.

As for Delaware case law, there simply is none stating that beneficial owners of a Delaware business trust owe fiduciary duties to one another just because they can give certain directions to the trustee.[3] Plaintiffs can offer, at best, only extended analogies to case law under other forms of commercial organization such as a close or closely-held corporation. *See,. e.g., Ueltzhoffer v. Fox Fire Dev. Co.,* 1991 WL 271584 (Del.Ch.1991); *S.A. Judah v. Delaware Trust Co.,* 378 A.2d 624, 628 (Del. 1977). But as the Delaware Supreme Court has stated rejecting efforts to import the special protections afforded under Delaware law for minority shareholders in a close corporation to those in a closely-held corporation, the Delaware legislature has authorized many forms of business organization, each with its own discrete statutory scheme, and these schemes "preempt the field in their respective area." *Nixon v. Blackwell,* 626 A.2d 1366, 1380 (Del.1993). To import rights and remedies afforded under one statutory scheme into another would not only "run counter to the spirit of the doctrine of independent legal significance" but would also "be inappropriate judicial legislation." *Id.* at 1380–81.

Accordingly, there being no legal basis for the fiduciary duties premised in Count Four, that count must be dismissed.

**3.** *Cantor Fitzgerald v. Cantor,* 2000 WL 307370 (Del.Ch. Mar.17, 2000), on which plaintiffs rely, simply reaffirmed the right of

partners in a limited partnership to expressly agree to assume fiduciary duties to one another.

■ *Count Five* of the Complaint asks the Court to impose a constructive trust on the allegedly unjust profits reaped by defendants through use of the Marks for their own interests and "without regard to the interests of CKI or the CK Trust, and the integrity of the Marks." Complaint, ¶ 147. Close inspection of Count Five shows, however, that the claim for imposition of a constructive trust is premised entirely on the assumption that defendants breached fiduciary duties to plaintiffs. *See, e.g.,* Complaint ¶¶ 144–46. Thus, since this Court has determined that no such fiduciary duties existed, Count Five must also be dismissed.

*Count Eight* of the Complaint charges that defendants Warnaco Group and Warnaco, through Warnaco Group's chief executive, defendant Wachner, "intentionally and willfully misrepresented to CKI, in response to a specific inquiry therefrom, that Warnaco would not distribute 'CALVIN KLEIN' underwear products in JC Penney stores," Complaint, ¶ 165, and thereafter did so.

■ As to defendant Warnaco, however, Count Eight must be stayed pending arbitration pursuant to section 3.5 of the Administration Agreement, which provides that "[a]ny dispute between CKI on the one hand, and Warnaco on its behalf and on behalf of all Trademark Owners on the other ... arising under any of Sections 2.10, 3.1, 3.2 *or 3.6* of this Agreement, which cannot be promptly resolved by the parties, shall be promptly resolved by a committee (the "Administration Committee") of three persons [selected by the parties]." Defendants' Exhibits, Vol. 2, Ex. 6, at 31 (emphasis added). In turn, section 3.6 of the Administration Agreement provides:

> In order to maintain the reputation and prestige of the Trademarks, each Trademark Owner and any licensees and sublicensees of each Trademark Owner shall only distribute the Warnaco Products through retails outlets and other channels of distribution ... whose location, source, merchandising and overall operation are consistent with the reputation and prestige of the Trademarks.

*See id.* at 32–33.

Seeking to avoid the combined effect of these sections, plaintiffs argue that the misrepresentation described in Count Eight—even though seemingly made in response to CKI's concern with "the reputation and prestige of the Trademarks"—was an independent promise that stood on its own regardless of whether or not it overlapped with the contractual promise embodied in § 3.6, and that, accordingly, Count Eight does not necessarily describe a dispute governed by arbitration. Plaintiffs also argue that, as applied to § 3.5, the arbitration provision of § 3.6 was only intended to settle disputes over the appropriateness of a particular distribution channel, and not claims that a party misrepresented which channels it would, in fact, use. But while these are conceivable interpretations of §§ 3.5 and 3.6, they are hardly the only or obvious ones, and thus are subject to the general rule that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Moreover, to construe these provisions as plaintiffs suggest would be to permit their easy evasion, whereas the broad language of the clauses in question implies, instead, that the parties intended a broad construction. *See, e.g., Collins & Aikman Prods. Co. v. Building Sys. Inc.,* 58 F.3d 16, 20 (2d Cir.1995). Thus, pursuant to Federal Arbitration Act, the Court must stay Count Eight as to defendant Warnaco. *See* 9 U.S.C. § 3 (1994).

No such agreement to arbitrate applies, however, to the other two defendants against whom Count Eight is brought: Warnaco Group and Wachner. Reaching

the merits as to them, the Court concludes that the Complaint fails to allege the minimal factual allegations necessary to state a claim for intentional misrepresentation, to wit, "that the defendant, *at the time the promissory representation was made,* never intended to honor or act on [its] statement." *Paper Corp. of United States v. Schoeller Technical Papers, Inc.,* 742 F.Supp. 808, 811 (S.D.N.Y.1990) (emphasis added) (applying New York law). Although the Complaint does allege that "shortly" after defendant Wachner made the J.C. Penney pledge, defendant Warnaco began distributing Calvin Klein goods to that store, the "mere failure of promised performance has never permitted a factual finding that defendants never intended to perform." *Soper v. Simmons Int'l, Ltd.,* 632 F.Supp. 244, 249 (S.D.N.Y.1986). *Accord Brown v. Lockwood,* 76 A.D.2d 721, 432 N.Y.S.2d 186, 194 (2d Dep't, 1980) ("Mere unfulfilled promissory statements as to what will be done in the future are not actionable as fraud."). Instead, there must be alleged at least some additional fact from which a prior intent to deceive may be inferred; but here there is none, only conclusory allegations of intent. Accordingly, Count Eight must be dismissed as to defendants Warnaco Group and Wachner.

■ Finally, *Count Sixteen* of the Complaint purports to state a claim under Section 349 of New York's General Business Law, a consumer protection statute. "While the statute does not preclude an action by one business against another, the gravamen of the complaint must be consumer injury or harm to the public interest." *Azby Brokerage, Inc. v. Allstate Ins. Co.,* 681 F.Supp. 1084, 1089 n. 6 (S.D.N.Y. 1988). For this reason, New York courts require that a plaintiff seeking relief under § 349 "must, at the threshold, charge conduct that is consumer oriented." *New York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995) *Accord Grand General Store, Inc. v.*

*Royal Indemn. Co.,* 1994 WL 163973, *3 (S.D.N.Y. Apr.22, 1994).

With respect to Count Sixteen, plaintiffs attempt to bring their claim within the purview of these requirements by alleging that defendants' unauthorized distribution of Calvin Klein goods to discount stores, as well as defendants' sale in Calvin Klein Outlet stores of "unapproved" Calvin Klein goods and of goods that were not Calvin Klein goods at all, deceived consumers into believing that there was more Calvin Klein sponsorship involved than there really was. *See* Complaint, ¶¶ 220–221. But it is obvious that this supposed consumer fraud is at best an incidental product of defendants' alleged breaches of contract that form the heart of the Complaint, and New York courts have made clear that "[section 349] should not be permitted to become an adjunct to ordinary commercial litigation." *Teller v. Bill Hayes, Ltd.,* 213 A.D.2d 141, 630 N.Y.S.2d 769, 774 (2d Dep't, 1995).

Moreover, to the extent that Count Sixteen alleges that consumers are being confused into believing that CKI has authorized either the sale of certain Calvin Klein designs that it did not approve or the sale of non–Calvin–Klein goods in Calvin Klein Outlet Stores, Count Sixteen merely describes confusion of the kind that underlies a claim for trademark or trade dress infringement: precisely the kind of company-oriented injury that New York courts have held not to fall within the ambit of section 349. *See Kompan A.S. v. Park Structures, Inc.,* 890 F.Supp. 1167, 1183 (N.D.N.Y.1995); *Jaret Int'l, Inc. v. Promotion in Motion, Inc.,* 826 F.Supp. 69, 78 (E.D.N.Y.1993). *See also* N.Y.Gen.Bus. § 349, at 567 (McKinney 1988) (Practice Commentaries) (noting that cases concerning trademark or "trade dress" infrigement "fall outside the original intent of §§ 349 and 350").

Finally, to the extent that Count Sixteen alleges that consumers are likely to be misled into believing that CKI has agreed to the distribution of "first quality" Calvin Klein goods at discount stores, it is hard to

see how the consumer is harmed at all, rather than benefitted, from believing that CKI approved the consumer's receiving first quality goods at rock bottom prices.

In short, because Count Sixteen fails to assert an injury "to consumers or to the public interest, other than the general variety of consumer confusion that is the gravamen of [a] trademark claim," Count Sixteen must be dismissed. *Mastercard Int'l, Inc. v. Arbel Corp.*, 1989 WL 125781, at *10 (S.D.N.Y. Oct.18, 1989).

For the foregoing reasons, the Court reaffirms its Order of August 29, 2000 dismissing Counts Four, Five, and Sixteen of the Complaint in their entirety, dismissing Count Eight as to defendants Wachner and Warnaco Group, and staying Count Eight as to defendant Warnaco pending arbitration.