**IN THE COURT OF CLAIMS OF OHIO**

| | |
|---|---|
| FREE STATE OF BAVARIA, REPRESENTED BY THE UNIVERSITY OF WURZBURG | Case No. 2022-00495JD |
| Plaintiff | Judge David E. Cain |
| v. | DECISION |
| THE OHIO STATE UNIVERSITY | |
| Defendant | |

## I.    Introduction

{¶1} Plaintiff Free State of Bavaria Represented by the University of Würzburg brings an original civil action against Defendant The Ohio State University.  Plaintiff's lawsuit concerns a dispute about compensation owing to Plaintiff from a collaboration between Dr. Michael Sendtner (a research scientist at the University of Würzburg) and Dr. Arthur Burghes (a research scientist at The Ohio State University).  Dr. Sendtner and Dr. Burghes collaborated to create a genetically modified mouse model, which, along with other genetically modified mouse models, proved useful in the development of a gene therapy for spinal muscular atrophy (SMA).[1]  Plaintiff seeks $49 million from Defendant, which Plaintiff asserts is the amount that Nationwide Children's Hospital in Columbus, Ohio—a non-party in this case—would have been obligated to pay Plaintiff in licensing fees if Defendant had met its legal obligations to Plaintiff.[2]

---

[1] Spinal muscular atrophy is a genetic disorder that, as stipulated by the parties, "is fatal to children and has been the subject of sophisticated research for decades."  Proposed Joint Stipulations of Fact filed on April 29, 2024, at paragraph 1.  The Court previously has approved the parties' Proposed Joint Stipulations of Fact.

[2] Under R.C. 2743.02(E) the only defendant in original actions in the Court of Claims of Ohio is the State.  *See* R.C. 2743.02(E).  As used in R.C. Chapter 2743, the term "state" means the State of Ohio, including, but not limited to, the General Assembly, the Supreme Court, the offices of all elected state

{¶2} After carefully considering all the admitted evidence presented at trial, as well as the parties' arguments, and, after a careful weighing of all the evidence, the Court holds that Plaintiff has not proven its civil claims by the requisite degree of proof for reasons that follow. The Court further holds that Defendant is entitled to a judgment in its favor.

## II.     Procedural History

{¶3} In an Amended Complaint Plaintiff asserted seven claims against Defendant (which Plaintiff labeled as "Counts"): (1) Breach Of Contract Regarding [An] Agency Agreement, (2) Breach Of Fiduciary Duty, (3) Fraud, (4) Rescission, (5) Unjust Enrichment, (6) Civil Conspiracy, and (7) Declaratory Judgment (wherein Plaintiff seeks a declaration that Defendant is obligated to reimburse Plaintiff for Plaintiff's and Dr. Sendtner's research, including but not limited to a declaratory judgment that Plaintiff is due royalties from all sales of approved Zolgensma®).[3]

{¶4} On Defendant's motion, the Court granted a partial summary judgment in Defendant's favor on Plaintiff's claim of Rescission. The matter proceeded to a bench trial on Plaintiff's remaining claims: (1) Breach Of Contract Regarding [An] Agency Agreement, (2) Breach Of Fiduciary Duty, (3) Fraud, (4) Unjust Enrichment, (5) Civil Conspiracy, and (6) Declaratory Judgment.

---

officers, and all departments, boards, offices, commissions, agencies, institutions, and other instrumentalities of the State. R.C. 2743.01(A).

Pursuant to R.C. 2743.02(E), and applying the statutory definition contained in R.C. 2743.01(A), Nationwide Children's Hospital (a non-party that, through counsel, appeared at trial), as well as The Abigail Wexner Research Institute at Nationwide Children's Hospital (another non-party that, through counsel, appeared at trial), are statutorily prohibited from being parties in this original action.

The Court takes judicial notice that Plaintiff has brought a related action against Nationwide Children's Hospital and others in federal district court. *See Free State of Bavaria Represented by the University of Würzburg v. The Ohio State University et al.*, case No. 2:22-cv-02580 (S.D. Ohio Jun 22, 2022). *See generally State ex rel. Coles v. Granville*, 2007-Ohio-6057, ¶ 20, citing *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d. Cir. 1992), quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[a] court may take judicial notice of a document filed in another court "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings'").

[3] The parties have stipulated that, on May 24, 2019, the United States Food and Drug Administration approved Zolgensma®, a gene therapy product intended to treat children less than two years of age with the most severe form of spinal muscular atrophy. Proposed Joint Stipulations of Fact filed on April 29, 2024, at paragraph 8.

**{¶5}** After Plaintiff presented its case-in-chief, Defendant moved for a directed verdict pursuant to Civ.R. 50.  The Court construed Defendant's Civ.R. 50 motion as a motion for dismissal under Civ.R. 41(B)(2); the Court denied Defendant's motion for dismissal; and Defendant proceeded with its case-in-chief.  The Court granted leave for the parties to file post-trial briefing.  After trial concluded, the Court held a hearing for the limited purpose of clarifying exhibits that had been, or should have been, admitted into evidence during trial.

### III.    Narrative of Factual Findings[4]
### A. Dr. Michael Sendtner and Dr. Arthur Burghes engage in a scientific collaboration.

**{¶6}** Dr. Michael Sendtner bred a mouse with a null allele ("null knockout mouse"). Dr. Sendtner published research about the "null knockout mouse" in scientific literature, which caught the attention of Dr. Arthur Burghes at The Ohio State University (OSU).  Dr. Burghes contacted Dr. Sendtner.  Dr. Burghes proposed a collaboration between himself and Dr. Sendtner.  Dr. Sendtner agreed to Dr. Burghes's proposed collaboration.

**{¶7}** At Dr. Burghes's request, Dr. Sendtner provided "null knockout mice" to Dr. Burghes for use in Dr. Burghes's research.  Dr. Burghes cross-bred Dr. Sendtner's mice with mice in Dr. Burghes's laboratory to create another mouse model (Severe SMA Mouse).  Dr. Burghes later used the Severe SMA Mouse model to develop another mouse model, the Delta 7 Mouse model.

**{¶8}** During Dr. Sendtner and Dr. Burghes's collaboration, Dr. Sendtner and Dr. Burghes exchanged emails; Dr. Burghes visited Dr. Sendtner in Europe; Dr. Sendtner hosted a doctoral student of Dr. Burghes in Germany, so the doctoral student could learn Dr. Sendtner's technique for counting motor neurons in mice in Dr. Sendtner's laboratory; and Dr. Sendtner and Dr. Burghes co-authored certain scientific articles.

**{¶9}** By email correspondence Dr. Sendtner permitted Dr. Burghes to provide Dr. Sendtner's "null knockout" mice to not-for-profit institutions, such as academic

---

[4] The Narrative of Factual Findings is based on <u>all</u> evidence admitted at trial (even if reference to certain evidence is not expressly stated in the Narrative of Factual findings).   By design the Narrative of Factual Findings is not intended to be an exhaustive summary of all the witness testimony and documentary evidence presented at trial, which was vast.  Nor is the Narrative of Factual Findings intended to constitute a complete record of the evidence presented at trial, such as a transcript of the trial proceedings.

institutions, for scientific research.  However, Dr. Sendtner asked Dr. Burghes to provide a copy of Plaintiff's Material Transfer Agreement (MTA) (a contract governing the transfer of tangible research materials) with Dr. Sendtner's "null knockout mice," when Dr. Burghes provided Dr. Sendtner's "null knockout mice" to not-for-profit institutions.  On August 28, 2002, in email correspondence between Dr. Sendtner and Dr. Burghes, Dr. Sendtner wrote,

> Dear Arthur,
>
> . . . .
>
> Please keep the MTA.  In case anybody asks you about the mice, send it directly to persons who would like to have them.  This saves time and makes things less complicated.  It took some time the MTA was approved.  The first version which I received was much heavier, I tried to eliminate any passages which could hinder transfer or cooperation.
>
> . . . .

(Email dated August 28, 2002, 12:11:19 PM.)

{¶10} Plaintiff's Material Transfer Agreement For The Distribution Of Biological Material (for non-profit recipients) contains the following provision concerning the commercial use of research materials:

> 7. The RECIPIENT is free to file patent applications claiming inventions made by the RECIPIENT through the use of the MATERIAL but agrees to notify the PROVIDER before filing a patent application claiming MODIFICATIONS or methods of manufacture or use of the MATERIAL.
>
> The RECIPIENT shall notify the PROVIDER if any profit is made by the COMMERCIAL USE of inventions (either patented or not) made through the use of the MATERIAL.  The PROVIDER shall receive 10% of such profit.
>
> If the RECIPIENT fails to notify the PROVIDER of filing a patent application or of making profit by COMMERCIAL USE as specified above, the PROVIDER shall receive the additional amount of 50,000 USD as penalty.

(Joint Exhibit EZ.)   On a case-by-case basis Plaintiff would negotiate the terms of its Material Transfer Agreement For The Distribution Of Biological Material (for non-profit recipients).

{¶11} Staff from OSU's Technology Commercialization Office (as it is now known) contacted Dr. Burghes at different times to inquire about the mouse model that was bred from Dr. Burghes's collaboration with Dr. Sendtner (i.e., the Severe SMA Mouse model), as well as to inquire about other matters.  Dr. Burghes advised TCO staff that Plaintiff had an ownership interest in the Severe SMA Mouse model because Dr. Sendtner had contributed a component to the Severe SMA Mouse model and Dr. Sendtner collaborated in the development of the Severe SMA Mouse model.

{¶12} On September 30, 2002, Dr. Burghes responded to an email from Kathleen Garber, J.D. (a Licensing Associate in Defendant's then-Office for Technology Licensing) about a request received by Defendant from Rinat Neuroscience Corporation for materials related to "your SMA Animal Model (SMN-/-; SMN2 mice, line 89."  Dr. Burghes wrote to Ms. Garber:

> . . . .
>
> The mice are composed of two parts first the german half which the KO allele developed by Micael Sendters lab in germany.  Therefore the[y] must work with the university of Wurzburg in regards to the k[n]ockout allele attached is an MTA covering academia.  Trophos (France) has already been trough this process and I would suggest following this model.  Robin Razor when she was at OSU put this together and Trophos got OSU and Wurzburg permission.  This person already knows that he needs to go through Wurzburg for the KO allele and us for the SMN2 allele . . . .

(Joint Exhibit K.)   Thus, since at least 2002 staff in Defendant's Technology Commercialization Office (as it is now known) had been on notice of Plaintiff's ownership interest in the Severe SMA Mouse model created by Dr. Sendtner and Dr. Burghes's collaboration.

{¶13} Plaintiff, through Dr. Sendtner, also informed Ms. Garber of Plaintiff's ownership interest in the Severe SMA Mouse model created by Dr. Sendtner and Dr.

Burghes's collaboration.  In response to an email query from Ms. Garber, Dr. Sendtner wrote:

> . . . .
>
> I send you as an attached file the MTA which our University has worked out for transfer of Smn +/-mice, which are usually crossbred with Arthur Burghes' mice in order to generate an animal model for SMA.  I suggest that you give out this file to anybody requesting the mice.  Otherwise, I could send it out to anybody who wishes to use these mice.  In case anybody wishes changes, he or she should contact me and I will direct to them to the contract department of our University.
>
> . . . .

(Joint Exhibit N.)


**B. Plaintiff and Defendant separately enter into licensing agreements with The Spinal Muscular Atrophy Foundation.**

**Defendant enters into an agreement with The Jackson Laboratory for the distribution of mice models.**

**Non-party Nationwide Children's Hospital obtains the Delta 7 Mouse model from The Jackson Laboratory.**

{¶14} Around 2004 The Spinal Muscular Atrophy Foundation (SMA Foundation), a nonprofit organization, undertook to have SMA mice deposited with The Jackson Laboratory, a biomedical research institution with a repository for mouse models.  The SMA Foundation entered into non-exclusive license agreements with both parties. Effective December 1, 2004, the SMA Foundation and Plaintiff entered into a non-exclusive license agreement.  (Proposed Joint Stipulations of Fact, at paragraph 2.)  And, effective March 9, 2005, SMA Foundation and Defendant entered into a non-exclusive license agreement. (Proposed Joint Stipulations of Fact, at paragraph 4.)

{¶15} On April 14, 2005—about a month after Defendant and the SMA Foundation entered into a non-exclusive license agreement—Defendant and The Jackson Laboratory (TJL) entered into a Letter of Agreement For Distribution (Letter of Agreement). (Proposed Joint Stipulations of Fact, at paragraph 5. Joint Exhibit AZ.)  In the Letter of

Agreement, Defendant and The Ohio State Research Foundation (collectively "INSTITUTION") represented

> to the best of its knowledge and belief that it has the legal right to license MICE, and hereby grants to TJL a non-exclusive license to make, breed, use, and sell MICE to the biomedical research community. While non-profit and academic institutions have permission to use MICE received from TJL solely for research purposes, INSTITUTION requires use licenses from for-profit entities. TJL agrees to inquire whether the party requesting MICE is a for-profit, and if so, will advise the party that it must first obtain a use license from INSTITUTION before receiving the MICE. TJL further agrees to send [an] attached Notice to all for-profits requesting the MICE.

(Joint Exhibit AZ.) Under the Letter of Agreement, for-profit entities purchasing the mice for commercial use were directed to Defendant to execute a licensing agreement with Defendant. (Proposed Joint Stipulations of Fact, at paragraph 6.) Defendant's Letter of Agreement with The Jackson Laboratory does not direct for-profit entities to execute a licensing agreement with Plaintiff.

{¶16} Defendant concedes that, at the time of Defendant's Letter of Agreement with The Jackson Laboratory, its Technology Commercialization Office (TCO), which, among other things, negotiates licensing agreements for inventions arising from university research, had been in "a horrible state of disarray." (Post-Trial Brief, 7.) Defendant relates, "From 2000 until around 2018-2019, the TCO suffered from a lack of financial and human resources, significant turnover in leadership, lack of an effective system to track research-related agreements, and lack of a comprehensive accounting system." (Post-Trial Brief, 7.)

{¶17} Notably, with respect to Dr. Burghes's Delta 7 Mouse model, by at least 2013 Defendant was licensing the Delta 7 Mouse model according to credible testimony elicited at trial. (Testimony of David Mess, Tr., 783.) And, in approximately 2016, Defendant generally was charging $80,000 per year for a license agreement for the Delta 7 Mouse model. (Testimony of David Mess, Tr., 876.)

{¶18} Meanwhile, a researcher who was affiliated with Nationwide Children's Hospital obtained the Delta 7 Mouse model from The Jackson Laboratory. This

researcher used the Delta 7 Mouse model in scientific investigations that proved useful in the development of Zolgensma®. Nationwide Children's Hospital has received a financial benefit for its role in the development of Zolgensma®.

### C. Plaintiff and Defendant negotiate a backdated Inter-Institutional Agreement.

{¶19} On December 13, 2016, Elizabeth M. Richards of Defendant's Technology Commercialization Office emailed Mr. René Demling, Plaintiff's legal counsel, about entering into an Inter-Institutional Agreement (IIA).[5] Ms. Richards wrote:

> Hello Rene,
>
> I am reaching out to you so that we can get an Inter-Institutional agreement,
> in place, as we recently discovered Ohio State and Wuerzburg are joint
> owners of the SMNΔ7 mouse (https://www.jax.org/strain/005025).
>
> I have attached OSU's standard IIA template for your review if you would
> like to move forward with this template. If not, please send me your template
> for review.
>
> . . . .

Two days later—on December 15, 2016—Mr. Demling emailed a response to Ms. Richards with copies of the response sent to Mr. David Mess of Defendant's Technology Commercialization Office, and Dr. Iris Zwirner-Baier in the Technology Transfer Office (TTO) of the University of Würzburg. Mr. Demling informed Ms. Richards that he forwarded the template to Dr. Zwirner-Baier. Mr. Demling stated, "The TTO is responsible for Inter-Institutional Agreements at our University. She will contact you as soon as we have reviewed the template. For reviewing the template, can you provide information about the scientists involved in generating the intellectual property regarding the mouse?. . . ." (Joint Exhibit DA.)

{¶20} On January 3, 2017, Ms. Elizabeth Richards emailed Mr. Demling and inquired: "Hi Rene, I just wanted to follow up on the status of the IIA, as we have yet to

---

[5] According to testimony elicited at trial, "Generally when there's a -- sort of an invention that arises from the work of two universities, you put in place an inter-institutional agreement to sort of talk about how the parties are going to do things like patenting, which wasn't the case in this case, but also how you're going to handle licensing of the invention." (Testimony of David Mess) (Tr. 787-788).

hear anything back?" (Joint Exhibit DA.) Eight days later—on January 11, 2017—in an email message to Ms. Richards (with a copy sent to Mr. David Mess), Dr. Zwirner-Baier related, "We have some open issues on this topic and we need the feedback of our scientist, who is hopefully available next week."

{¶21} On January 23, 2017, Mr. David Mess, who at that time was the Assistant Director, Licensing, within Defendant's Technology Commercialization Office, wrote to Dr. Zwirner-Baier,

> . . . .
>
> Elizabeth is no longer with Ohio State. Kristina Jeckering (copied) and I will be your contact at Ohio State for this matter.
>
> We have received another inquiry from a company that would like to license this mouse model. The license would be $80,000 and we propose splitting that equally with the University of Wurzburg.
>
> . . . .

(Joint Exhibit DA.)

> About a week later—on January 31, 2017—Dr. Zwirner-Baier responded,
>
> Dear David,
>
> Thank you for your email. After talking to our scientist Prof. Sendtner, we have some questions:
>
> The University of Würzburg has an existing non exclusive licence agreement regarding the Smn +/- mutant mice with the SMA Foundation. Are the same mice subject to the suggested IIA? How is the Ohio State University in the research projects with the SMA foundation involved? Is the IIA agreement independent to the SMA contract?
>
> We do not know the history behind your IIA proposal.
>
> We would highly appreciate to receive some further information from you.
>
> . . . .

(Joint Exhibit DA.) That same day—January 31, 2017—Mr. Mess replied, "We had an agreement with the SMA Foundation however it is now expired." (Joint Exhibit DA.) Mr. Mess's email contained no comment about Defendant's arrangement with The

Jackson Laboratory that Defendant entered into on April 14, 2005—almost twelve years earlier.

{¶22} According to credible testimony elicited at trial, before the parties entered into an Inter-Institutional Agreement, Defendant had no intent to pay Plaintiff for the licensing that had happened before the parties' Inter-Institutional Agreement. (Testimony of David Mess) (Tr., 788-789.) And, before the parties formally entered into an Inter-Institutional Agreement, on July 26-27, 2017, Dr. Iris Zwirner-Baier and Mr. Mess had the following email exchange:

> Dear David,
>
> We have checked the agreement and we can agree to the most terms but one minor concern remains. Our agreement should start in April 2005 as effective date and the licence fees in Juli 2017.
>
> There is a 12 year period between both dates. It doesn't make sense to us. According to our budget law it is very difficult for us to push back the begin of the agreement in 2005.

In response, Mr. Mess wrote:

> Hi Iris,
>
> Yes, that's right. We just recently became aware of the contribution the University of Wuerzburg made to the mouse model that was created in 2004 or 2005. Ohio State has entered into agreements since then and July 2017 would start the sharing of revenue with University of Wuerzburg.
>
> If there is a better way to achieve this, we would certainly welcome that.

> In response, Dr. Zwirner-Baier wrote:
>
> Hi David,
>
> As I understand OSU made some licensing deal without knowing the University of Würzburg was Co-owner. My suggestion is to pay a fee about 25.0000 US Dollar to the University of Würzburg for the period between 2005 and 2017.
>
> I hope this is acceptable to OSU.

. . . .

Mr. Mess replied to Dr. Zwirner-Baier, stating:

> Hi Iris,
>
> I think that makes sense.  Can you send over the agreement incorporating that concept for final review?
>
> . . . .
>
> Dr. Zwirner-Baier later inquired of Kristina Jeckering and Mr. Mess, stating:
> Dear Kristina, dear David,
>
> I will come back to you as soon as our legal department gives me a feedback.
>
> Lately I talked to our scientist Prof. Sendtner, who is one of the mouse creators.  He wants to know which companies have received a mice license from OSU.  Can you make this information available?

(Plaintiff UW Exhibit 11.)  Mr. Mess responded:

> Hi Iris,
>
> I think we will be able to share the specific names after IIA is entered into because of confidentiality provisions.  Our database shows that 7 companies have received commercial licenses from Ohio State directly (note that only relatively recently (around 2013) have we realized that we can charge a significant fee).

(Plaintiff UW Exhibit 11.)  However, on cross-examination, Mr. Mess generally agreed that certain license agreements failed to contain confidentiality provisions.  (Tr., 800-802.)

{¶23} In September 2017 Plaintiff entered into an Inter-Institutional Agreement (IIA) with Defendant that had an effective date of April 14, 2005.  (Tr., 908; Joint Exhibit BA.) Under the transaction terms in the IIA, each party is entitled to a 50% share of net consideration.  (Joint Exhibit BA.)  The Inter-Institutional Agreement contains a provision for a lump sum payment:

> 3.4 <u>Lump Sum Payment</u>: As consideration of licensing revenue received by the Lead Institution from April 14, 2005 until July 1, 2017, the Lead Institution [The Ohio State University] will pay from the Net

Consideration a one-time lump sum payment of $25,000 USD to the Other Institution [Freistaat Bayern represented by the University of Wuerzburg]. For the avoidance of doubt, in the event Lead Institution enters into a License Agreement after the Effective Date and receives $80,000 in License Consideration, the first $80,000 of License Consideration will be allocated as follows: $61,000 to Other Institution, $8,000 to Jackson Lab, and $11,000 to Lead Consideration.   Thereafter, License Consideration shall be allocated as set forth in Section 3.1(b), above.

(Joint Exhibit BA.)  Section 3.1(b) of the Inter-Institutional Agreement provides: "The Lead Institution will deduct from the License Consideration and retain for itself or reimburse the Other Institution(s) the following amounts: the Administration Fee.  The Net Consideration will be distributed to the Other Institution(s) in accordance with the Share of Net Consideration set forth in the Transaction Terms."  (Joint Exhibit BA.)

{¶24} Defendant has attempted to make payment to the University of Würzburg for licensing revenues, but Plaintiff has refused to accept those funds.  (Tr., 659.)  At trial, in response to a question by the Court, Dr. Iris Zwirner-Baier explained:

{¶25} We had received an email from OSU that went into our spam.  And then we received a second email where a sum of $800,000 was offered.

{¶26} Then we found the old email in the spam, and that was two months before where they offered the sum of $200,000.  And I was extremely surprised how within two months, $200,000 became $800,000.

{¶27} I talked to legal and my financial departments and we discussed this, and we concluded something cannot be correct, something has to be wrong.  And we would want to clear that up first.

(Tr. 662-663.)

## IV.    Law and Analysis

{¶28} Plaintiff suggests that the proffered evidence establishes that Defendant, through its employees, acted in a dishonest manner and in bad faith.  Plaintiff asserts that it expected that Dr. Sendtner and Dr. Burghes's Severe SMA Mouse model would be made available to requesting organizations in the following manner:

(1) To partners of the SMA Foundation (SMAF Partners) through Plaintiff's and Defendant's Individual License Agreements with the SMA Foundation,

(2) To non-SMAF Partners (e.g., for-profit or commercial entities) through licenses from Plaintiff and Defendant, and

(3) To non-profit institutions through Plaintiff's Material Transfer Agreement.

{¶29} Plaintiff maintains that Defendant harmed Plaintiff by Defendant's negotiation with The Jackson Laboratory and by Defendant's entering into a Letter Agreement with the Jackson Laboratory. Plaintiff further maintains that Defendant, through its employees, directly misrepresented the Letter of Agreement to Plaintiff through Defendant's employees' email correspondence and in Defendant's negotiation for a back-dated Inter-Institutional Agreement. Plaintiff asserts that, absent an executed Material Transfer Agreement with Plaintiff, Nationwide Children's Hospital would not have been able to use the Delta 7 Mouse model in its research that contributed to the development of Zolgensma®.

{¶30} Defendant disputes that its employees acted in a dishonest manner and in bad faith. Defendant essentially urges that the parties established a scientific collaboration through Dr. Sendtner and Dr. Burghes to create the Severe SMA Mouse model, that Dr. Burghes created the Delta 7 Mouse model from the Severe SMA Mouse model, which researchers later used as a tool in the development of the gene therapy of Zolgensma®, that Plaintiff did nothing to develop the gene therapy of Zolgensma®, and that Plaintiff is entitled to 50% of the licensing fees under the parties' Inter-Institutional Agreement and nothing more.

### A. Plaintiff has the burden of production and the burden of persuasion.[6]

---

[6] The Ohio Supreme Court has discussed the burden of proof as follows:

* * * [T]he "burden of proof" is a composite burden that "encompasses two different aspects of proof: the burden of going forward with evidence (or burden of production) and the burden of persuasion." *Chari v. Vore*, 91 Ohio St.3d 323, 326, 2001-Ohio-49, 744 N.E.2d 763 (2001). *See also Xenia v. Wallace*, 37 Ohio St.3d 216, 219, 524 N.E.2d 889 (1988); *State v. Robinson*, 47 Ohio St.2d 103, 107, 351 N.E.2d 88 (1976).

The "burden of production" in a civil case requires that the plaintiff produce sufficient evidence to support the case and that the defendant produce sufficient evidence of any affirmative defenses. *Id.* at 107. The party having the burden on any given issue will lose on that issue as a matter of law if sufficient evidence is not produced. *Id.*

{¶31} On trial of a civil case, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Here, the Court is the trier-of-facts. *See* R.C. 2743.03(C)(1) ("[a] civil action against the state shall be heard and determined by a single judge"). The Court, as the trier-of-facts in this case, is free to believe all, part, or none of the testimony of the witnesses who have appeared before it in this case. *See State v. Green*, 2004-Ohio-3697, ¶ 24 (10th Dist).

{¶32} Under Ohio law a plaintiff generally is required to establish civil claims by a preponderance of the evidence. *See Merrick v. Ditzler*, 91 Ohio St. 256, 260 (1915) ("[i]n the ordinary civil case the degree of proof, or the quality of persuasion as some text-writers characterize it, is a mere preponderance of the evidence"); *Weishaar v. Strimbu*, 76 Ohio App.3d 276, 282 (8th Dist.1991). A preponderance of the evidence "is defined as that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence." *State ex rel. Doner v. Zody*, 2011-Ohio-6117, ¶ 54.

{¶33} Elements of fraud, however, "must be established by clear and convincing evidence." *Trepp, LLC v. Lighthouse Commer. Mtge., Inc.*, 2010-Ohio-1820, ¶ 20 (10th Dist.). Clear and convincing evidence "is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. The burden to prove fraud "rests upon the party alleging the fraud." *Trepp* at ¶ 20, citing *First Discount Corp. v. Daken*, 75 Ohio App. 33 (1944) (1st. Dist.), paragraph seven of the syllabus.

---

By contrast, the "burden of persuasion" "refers to the risk . . . borne by a party if the jury finds that the evidence is in equilibrium." *Id.* "In a civil case, the party with the burden of persuasion is to persuade the trier of fact by a preponderance of the evidence, or upon some issues, by clear and convincing evidence." *Id.* The party with this burden will lose if he or she fails to persuade the trier of fact that the alleged fact is true by such quantum of evidence as the law demands. *Id.* If the trier of fact finds itself in doubt, "it must decide the issue against the party having the burden of persuasion." *Id.*

*Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, 2020-Ohio-5371, ¶ 20-22.

**B. Plaintiff has not proven its claim of fraud by clear and convincing evidence.**

{¶34} At trial Plaintiff maintained that Defendant, through its employees (for example, Mr. David Mess), knowingly made false statements, misrepresented facts, and concealed material facts from Plaintiff to induce Plaintiff to enter into a back-dated Inter-Institutional Agreement (IIA) with Defendant.

With respect to fraud, the Tenth District Court of Appeals has explained:

The elements of a fraud claim are:

> (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) the representation was material to the transaction, (3) the representation was made falsely, with knowledge of its falsity, or with such disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) the representation was made with the intent of misleading another into relying on it, (5) justifiable reliance on the representation or concealment, and (6) an injury proximately caused by the reliance.

*Wiles v. Miller*, 10th Dist. No. 12AP-989, 2013-Ohio-3625, ¶ 33, 3 N.E.3d 226, citing *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998).

*O'Brien v. Ashley*, 2021-Ohio-4064, ¶ 13 (10th Dist.). All elements of fraud must be present to find actionable fraud. *Malek v. Eresearch Tech. Inc.*, 2022-Ohio-3330, ¶ 24 (8th Dist.), citing *Westfield Ins. Co. v. HULS Am., Inc.*, 128 Ohio App.3d 270, 280 (10th Dist.1998). The "absence of even one of these elements precludes recovery." *Malek* at ¶ 24, citing *HULS Am., Inc.*, 128 Ohio App.3d at 280.

{¶35} After assessing Mr. Mess's demeanor and the credibility of Mr. Mess's testimony, and, after weighing the evidence, the Court finds that, while Plaintiff has shown that some of Mr. Mess's email statements to Dr. Zwirner-Baier were inaccurate (e.g., "We just recently became aware of the contribution the University of Wuerzburg made to the mouse model that was created in 2004 or 2005"), or perhaps even cagey (e.g., Mr. Mess's failure to disclose Defendant's agreement with The Jackson Laboratory to Dr. Iris Zwirner-

Baier), Plaintiff has failed to prove that Mr. Mess's representations to Dr. Iris Zwirner-Baier were made falsely, with knowledge of the falsity, or with such disregard and recklessness as to whether the representations were true or false, or with an intent of misleading Plaintiff to rely on the representations. Furthermore, the Court finds that the evidence shows that Defendant disclosed to Plaintiff (1) the number of companies who received licenses from Defendant, (2) the fees that Defendant charged these companies, and (3) the amount of payment received from the licenses. In view of these findings, the Court concludes that Plaintiff cannot, and has not, established all the required elements of a claim of fraud.

{¶36} Under Ohio case law a fraud claim "'may not be based on a misrepresentation made to a third party.'" *O'Brien v. Ashley*, 2021-Ohio-4064, ¶ 15 (10th Dist.), quoting *Wiles v. Miller*, 2013-Ohio-3625, ¶ 37 (10th Dist.). To the extent that Plaintiff contends that Defendant engaged in fraud through misrepresentations contained in the Letter of Agreement to The Jackson Laboratory (a third party), such a contention fails, as a matter of law. *O'Brien* at ¶ 37.

{¶37} Accordingly, after carefully weighing all the admitted evidence and the credibility of witnesses' testimony, the Court determines that Plaintiff has failed to prove all the elements of fraud by clear and convincing evidence. Plaintiff's claim of fraud therefore fails.

### C. Plaintiff has not proven its claim of breach of fiduciary duty by a preponderance of the evidence.

{¶38} Under Ohio case law a fiduciary duty "'is generally defined as a duty of utmost good faith, trust, confidence, and candor owed by a fiduciary to the beneficiary; a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person.'" *Wood v. Cashelmara Condominium Unit Owners Assn.*, 8th Dist. Cuyahoga No. 110696, 2022-Ohio-1496, ¶ 34 (8th Dist.), quoting *DiPasquale v. Costas*, 2010-Ohio-832, ¶ 122 (2d Dist.) (quotations and alterations omitted).

{¶39} Ohio case law recognizes a claim of breach of a fiduciary duty as an equitable action. *See*, *e.g.*, *Health Alliance of Greater Cincinnati v. Christ Hosp.*, 2008-Ohio-4981, ¶ 24 (1st Dist.) ("[i]n an equitable action involving a breach of fiduciary duty,

the trial court has discretion in fashioning an appropriate remedy to protect the interest of the beneficiary"); *Ross Sinclaire & Assocs., LLC v. Huntington Natl. Bank*, 2018-Ohio-661, ¶ 24 (10th Dist.) ("[o]ne asserting a claim of breach of fiduciary duty must establish the existence of a fiduciary duty, breach of that duty, and injury proximately caused by the breach").

{¶40} Discussing what constitutes a fiduciary relationship, the Court of Appeals of New York has stated:

> A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" (Restatement [Second] of Torts § 874, Comment *a*).  Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions (*see Northeast Gen. Corp. v Wellington Adv.*, 82 N.Y.2d 158, 162, 624 N.E.2d 129, 604 N.Y.S.2d 1 [1993]). Generally, where parties have entered into a contract, courts look to that agreement to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency" (*see id.* at 160).  "If the parties . . . do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them" (*id.* at 162).  However, it is fundamental that fiduciary "liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation" (Restatement [Second] of Torts § 874, Comment *b*).

*EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19-20 (2005).

{¶41} In the Court's view, the evidence establishes that Plaintiff and Defendant, through Dr. Sendtner and Dr. Burghes, collaborated in limited research, as demonstrated by Dr. Sendtner's sharing of his "null knockout mouse" with Dr. Burghes, and Dr. Sendtner's and Dr. Burghes's shared authorship of certain scientific articles.  The parties' collaboration was not merely an arm's length business transaction subject to the level of trust in the marketplace.  The parties' collaboration required both Plaintiff and Defendant

to act with a high degree of honesty, good faith, trust, confidence, and candor in accordance with accepted scientific norms.

{¶42} The evidence also establishes, however, that, at times, Defendant acted in a manner that failed to instill confidence as (1) Defendant effectively misrepresented its authority to grant licenses for the Severe SMA Mouse model and Delta 7 Mouse model to The Jackson Laboratory and (2) some of Defendant's employees' email correspondence with Dr. Zwirner-Baier lacked precision and candor during the parties' negotiation for a backdated Inter-Institutional Agreement.

{¶43} Plaintiff urges that Defendant owed, and breached, fiduciary duties to Plaintiff. But if Defendant owed fiduciary duties to Plaintiff, then Defendant would have had a duty to act in Plaintiff's best interests, even to Defendant's own detriment. *See Groob v. KeyBank*, 2006-Ohio-1189, ¶ 25 ("[a] bank's committing to keep a customer's information confidential does not create an obligation to act only in its customer's best interest, even to its own detriment, which is what a fiduciary relationship requires"). The evidence shows, however, that, under the parties' collaborative arrangement, Defendant was not required to act solely in Plaintiff's best interests. Rather, the evidence shows that both parties acted with self-interest in protecting the discoveries and inventions of their respective research scientists through separate licensing agreements. And, under the parties' collaborative arrangement, Dr. Burghes was able to pursue additional research interests, including developing the Delta 7 Mouse model, which proved valuable in the development of Zolgensma®.

{¶44} After carefully weighing the evidence and the credibility of the witnesses' testimony, the Court holds that Plaintiff has not proven by a preponderance of the evidence its breach-of-a-fiduciary-duty claim.

### D. Plaintiff's declaratory-judgment claim essentially is subsumed into Plaintiff's breach-of-contract claim with an analysis of the breach-of-contract claim governing the declaratory-judgment claim.

{¶45} Plaintiff seeks a declaration that Defendant is obligated to reimburse Plaintiff for Dr. Sendtner's research and Plaintiff is due royalties from all sales of approved Zolgensma®. Plaintiff's declaratory-judgment claim essentially is subsumed into Plaintiff's breach-of-contract claim. And the analysis concerning Plaintiff's breach-of-contract claim

governs Plaintiff's declaratory-judgment claim. See *Ambulatory Care Affiliates, Ltd. v. OhioHealth Corp.*, 2010-Ohio-3035, (10th Dist.), ¶ 10 (actions for declaratory judgment are special proceedings but when a declaratory judgment claim is asserted within the context of an ordinary civil action for breach of contract, the underlying action governs an appellate court's analysis); *see also* R.C. 2743.03(A)(2) (generally providing that, if a claimant also files a claim for declaratory judgment, injunctive relief, or equitable relief that arises out of the same circumstances that gave rise to the claimant's civil action against the state, this Court has exclusive, original jurisdiction to hear and determine that claim).

### E. Plaintiff has not proven its claims of breach of contract and declaratory judgment by a preponderance of the evidence.

{¶46} Plaintiff contends in its Amended Complaint that Dr. Sendtner and Dr. Burghes's collaboration created an enforceable contract. Defendant disputes Plaintiff's contention.

{¶47} "'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'" *Kostelnik v. Helper*, 2002-Ohio-2985, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F. Supp. 409, 414 (N.D. Ohio 1976). To establish a claim for breach of contract under Ohio law, a plaintiff "must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, ¶ 28 (10th Dist.), citing *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 41; *Jarupan v. Hanna*, 2007-Ohio-5081, ¶ 18, (10th Dist.). The party seeking to recover for a breach of contract bears the burden of proving each element of a breach-of-contract claim. *Claris, Ltd.* at ¶ 47.

{¶48} To declare the existence of a contract, "both parties to the contract must consent to its terms; there must be a meeting of the minds of both parties; and the contract must be definite and certain." (Citations omitted.) *Episcopal Retirement Homes v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991). *Black's Law Dictionary* (12th Ed. 2024) defines "meeting of the minds" as "[a]ctual assent by both parties to the

formation of a contract, meaning that they agree on the same terms, conditions, and subject matter." *Black's Law Dictionary* notes: "Although a meeting of the minds was required under the traditional subjective theory of assent, modern contract doctrine requires only objective manifestations of assent." *Id.*

{¶49} The Tenth District Court of Appeals has stated, "Parties manifest their mutual assent either by making a promise or by beginning or rendering performance." *Gates v. Praul*, 2011-Ohio-6230, ¶ 18 (10th Dist.), citing *Ford v. Tandy Transp.*, 86 Ohio App.3d 364, 380 (4th Dist.1993). And the United States Court of Appeals for the Sixth Circuit has explained:

> It is a fundamental tenet of contract law that a legally binding contract can be implied "from the circumstances and conduct of the parties." *Cooper v. Lakewood Eng'g & Mfg. Co.,* 45 F.3d 243, 246 (8th Cir. 1995). In "circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract," a contract implied in fact arises. *Luithly v. Cavalier Corporation; New Era Vending, Inc.*, 1999 U.S. App. LEXIS 10653, at *8 (6th Cir. 1999) *quoting Weatherly v. American Ag. Chem. Co.,* 16 Tenn. App. 613, 65 S.W.2d 592, 598 (Tenn. App. 1933). "An implied-in-fact contract is one that is 'founded upon a meeting of minds which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Conglomerated Hosts, Ltd., v. Jepco, Inc.,* 1992 U.S.App. LEXIS 1672, at *16 (6th Cir. 1992) *quoting Parker v. Department of Health, Education, and Welfare,* 478 F. Supp. 1156, 1160 (M.D. Tenn. 1979). "Hence, the distinctive feature of an implied in fact contract is that it is implied from conduct and circumstances; aside from this there is no difference between an express contract and an implied contract." *Conglomerated Hosts,* 1992 U.S.App. LEXIS 1672 at * 16-17.

*Contship Containerlines v. Howard Industries*, 309 F.3d 910, 912-913 (6th Cir.2002).

{¶50} The Court finds that Plaintiff's breach-of-contract claim fails for several reasons. First, the evidence establishes, by a preponderance, that Dr. Sendtner and Dr.

Burghes had authority to conduct research in accordance with scientific norms and institutional guidelines from their respective academic institutions. But the Court finds insufficient evidence to support any conclusion that Dr. Sendtner and Dr. Burghes had actual or apparent authority to contractually bind their respective academic institutions. *See generally Drake v. Med. College*, 120 Ohio App.3d 493, 496 (10th Dist.1997) ("public officers cannot bind the state by acts outside their express authority"). Ohio statutory law expressly confers a right to enter contracts upon the Board of Trustees of The Ohio State University. R.C. 3335.03(A).

{¶51} Second, under Ohio's Statute of Frauds, "[n]o action shall be brought whereby to charge the defendant . . . upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized." R.C. 1335.05. Therefore, any alleged oral contract between Dr. Sendtner and Dr. Burghes, which would not be fully performed within a one-year period, would be unenforceable under the Statute of Frauds set forth in R.C.1335.05. *See ZBS Industries v. Anthony Cocca Videoland*, 93 Ohio App.3d 101, 105 (8th Dist.1994). Here, however, according to Plaintiff, Dr. Sendtner's and Dr. Burghes's collaboration lasted more than one year.

{¶52} Third, even if Dr. Sendtner and Dr. Burghes's email correspondence and collaboration reasonably could be construed to form a contract, the Court finds that the terms of the purported contract are not definite and certain. Under Ohio law a contract is not enforceable when the terms are not sufficiently definite. *Phu Ta v. Chaudhry*, 2016-Ohio-4944, ¶ 13 (10th Dist.). The Tenth District Court of Appeals has instructed: "The terms of a contract are sufficiently certain or definite where they 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" *Phu Ta* at ¶ 14, quoting *Mr. Mark Corp. v. Rush, Inc.*, 11 Ohio App.3d 167 (8th Dist.1983), quoting Restatement of the Law 2d, Contracts, Section 33 at 92 (1981). The Court finds that Dr. Sendtner's and Dr. Burghes's email correspondence does not provide a basis for giving an appropriate remedy, even if Dr. Sendtner and Dr. Burghes's email correspondence demonstrates an agreement for Dr. Burghes to include Plaintiff's Material Transfer

Agreement when Dr. Burghes forwarded Dr. Sendtner's "null knockout" mice to not-for-profit entities.

{¶53} Fourth, Plaintiff's claim of $49 million in damages against Defendant is based on speculation—namely, a notion that, if Defendant had not misrepresented its authority to license mice to The Jackson Laboratory, Nationwide Children's Hospital would have agreed to the terms in Plaintiff's Material Transfer Agreement For The Distribution Of Biological Material (for non-profit recipients) with its requirement that Plaintiff would receive 10% of profits made from commercial use of Dr. Sendtner's "null knockout" mouse.  See Joint Exhibit EZ.  Under Ohio law compensatory damages "must be shown with certainty, and damages that are too speculative are not recoverable.  *Carey v. Down River Specialties, Inc.*, 2016-Ohio-4864, ¶ 29 (8th Dist.), citing *Moton v. Carroll*, 2002-Ohio-567, (10th Dist.).  *Accord Cruz v. Warehouse Sales by C.H.I.P.*, 1996 Ohio App. LEXIS 543, at *5 (10th Dist. Feb. 13, 1996) (evidence of damages "must be shown with a reasonable degree of certainty and speculative damages are not recoverable").

{¶54} At trial Amy Roscoe, who previously served as Manager of Business Development and Licensing at The Abigail Wexner Research Institute at Nationwide Children's Hospital, credibly testified that, as a nonprofit organization, The Abigail Wexner Research Institute, would not engage in commercial terms in its material transfer agreements.  (Tr. 1259.)  And Roscoe also credibly testified that, in a past material transfer agreement with the University of Würzburg, The Abigail Wexner Research Institute did not agree to the commercial terms as set forth in paragraph 7 of a material transfer agreement with the University of Würzburg.  (Tr., 1268.)

{¶55} After carefully weighing the evidence and the credibility of the witnesses' testimony, the Court holds that Plaintiff has not proven by a preponderance of the evidence its breach-of-contract claim and its declaratory-judgment claim.

### F.  Plaintiff has not proven its claim of civil conspiracy by a preponderance of the evidence.

{¶56} In Plaintiff's Amended Complaint, Plaintiff essentially contends that Defendant, Brian Kaspar, Ph.D. (a research scientist formerly affiliated with Nationwide Children's Hospital), Nationwide Children's Hospital, The Abigail Research Institute at

Nationwide Children's Hospital, and Dr. Arthur Burghes conspired to fraudulently induce the University of Würzburg to enter into Inter-Institutional Agreement, thereby breaching Defendant's fiduciary duties to Plaintiff.

{¶57} Civil conspiracy "has been defined as 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (1995), quoting *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 126 (1987), citing *Minarik v. Nagy*, 8 Ohio App.2d 194, 196 (8th Dist. 1963). A civil conspiracy claim "'"is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy."'" *O'Brien v. Ashley*, 2021-Ohio-4064, ¶ 17 (10th Dist.), quoting *Adams v. Margarum*, 2017-Ohio-2741, ¶ 21 (10th Dist.), quoting *Morrow v. Reminger & Reminger Co., LPA*, 2009-Ohio-2665, ¶ 40 (10th Dist.).

{¶58} The Court finds that the evidence presented at trial establishes that, by a preponderance of the evidence, mice used in Dr. Kaspar's research when Dr. Kaspar was affiliated with Nationwide Children's Hospital were obtained from The Jackson Laboratory—not from Defendant—and that Dr. Arthur Burghes, through his research, collaborated with researchers at Nationwide Children's Hospital. The evidence presented at trial does not, however, establish by a preponderance of the evidence that Defendant, with Dr. Kaspar, Nationwide Children's Hospital, The Abigail Wexner Research Institute at Nationwide Children's Hospital, and Dr. Burghes, conspired to fraudulently induce Plaintiff to enter into the Inter-Institutional Agreement with Defendant. The Court finds insufficient evidence was presented at trial to establish that Defendant, Dr. Burghes, Dr. Kaspar, Nationwide Children's Hospital, and The Abigail Wexner Research Institute engaged in an underlying tort to fraudulently induce Plaintiff to enter into the Inter-Institutional Agreement with Defendant.

{¶59} After carefully weighing the evidence and the credibility of the witnesses' testimony, the Court holds that Plaintiff has not established its derivative claim of civil conspiracy by a preponderance of the evidence.

### G. Plaintiff has not proven its claim of unjust enrichment by a preponderance of the evidence.

{¶60} In Plaintiff's claim of unjust enrichment in the Amended Complaint, Plaintiff asserts that Defendant received the benefit of mice containing Dr. Sendtner's knockout allele and Defendant used these mice to develop further research and knowledge towards a treatment for spinal muscular atrophy. Plaintiff further asserts that it would be inequitable for Defendant to retain benefits received at the expense of Plaintiff without compensation to Plaintiff.

{¶61} Unjust enrichment presents an equitable claim. *Sterling Contracting, LLC v. Main Event Ent., LP*, 2022-Ohio-2138, ¶ 18 (8th Dist.). In *Sterling Contracting, LLC*, the Eighth District Court of Appeals explained:

> "[U]njust enrichment is an equitable claim that applies when one retains a benefit that 'in justice and equity belong[s] to another' and that restitution is afforded as a remedy 'to prevent one from retaining [a benefit] to which he is not justly entitled.'" *State Farm Mut. Auto. Ins. Co. v. Balcer Performance & Restoration*, 8th Dist. Cuyahoga No. 106768, 2018-Ohio-4868, ¶ 16, quoting *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 20, *Hummel v. Hummel*, 133 Ohio St. 520, 528, 14 N.E.2d 923 (1938), and *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 256, 141 N.E.2d 465 (1957). "[T]he purpose of such claims 'is not to compensate the plaintiff for any loss or damage suffered by him *but to compensate him for the benefit he has conferred on the defendant.*'" (Emphasis added.) *Johnson* at ¶ 21, quoting *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d 393 (1954). "The goal of equitable relief is not to punish . . . ." *Sun Prairie v. Cason*, D.S.D. No. 3:02-CV-03030-RAL, 2016 U.S. Dist. LEXIS 86349, 16 (July 1, 2016), quoting *Graves v. Romney*, 502 F.2d 1062, 1064-1065 (8th Cir.1974).

(Emphasis sic.) *Sterling Contracting, LLC* at ¶ 18.

{¶62} A party asserting an unjust enrichment claim "must come to court with clean hands." *Just Like Us Family Enrichment Ctr. v. Easter*, 2010-Ohio-4893, ¶ 19 (8th Dist.). "The 'clean hands doctrine' of equity requires that whenever a party takes the initiative to set in motion the judicial machinery to obtain some remedy but has violated good faith by his prior-related conduct, the court will deny the remedy." *Marinaro v. Major Indoor*

*Soccer League*, 81 Ohio App.3d 42, 45, (9th Dist.1991), quoting *Bean v. Bean*, 14 Ohio App.3d 358, 363-364, (12th Dist.1983).

**{¶63}** Based on evidence presented at trial, the Court finds that Defendant has attempted to make payment to the University of Würzburg for licensing revenues, but Plaintiff has refused to accept those funds. (Tr., 659.) Plaintiff's refusal to accept its share of licensing funds effectively has conferred a benefit upon Defendant, thereby contradicting Plaintiff's equitable claim of unjust enrichment.

**{¶64}** Moreover, the evidence shows that Plaintiff exercised due diligence before Plaintiff entered into a backdated Inter-Institutional Agreement with a provision for a lump sum payment of $25,000 USD as consideration of licensing revenue previously received by Defendant, as suggested by Dr. Iris Zwirner-Baier.

**{¶65}** Notably, the Supreme Court of Ohio has explained:

"[I]t is not the province of courts to relieve parties of improvident contracts." *Ohio Crane Co. v. Hicks* (1924), 110 Ohio St. 168, 172, 2 Ohio Law Abs. 275, 143 N.E. 388, 22 Ohio L. Rep. 74. In addition, "unless there is fraud or other unlawfulness involved, courts are powerless to save a competent person from the effects of his own voluntary agreement." *Ullmann v. May* (1947), 147 Ohio St. 468, 476, 34 O.O. 384, 72 N.E.2d 63.

*Dugan & Meyers Constr. Co. v. Ohio Dept. of Adm. Servs.*, 2007-Ohio-1687, ¶ 29.

**{¶66}** Where legal rights are defined and settled by the rules of law, then equity follows the law. *See In re Barone*, 2005-Ohio-4479, ¶ 19 (11th Dist.). The Seventh District Court of Appeals has explained,

[T]he Ohio Supreme Court has held that when there is no cause of action at law, there can be none in equity. <u>Salem Iron Co. v. Hyland</u> (1906), 74 Ohio St. 160, 167, 77 N.E. 751. The Court further noted in <u>Schwaben v. School Emp. Retirement Sys.</u> (1996), 76 Ohio St. 3d 280, 285, 667 N.E.2d 398, that, while it may be tempting to decide a case on subjective principles of equity and fundamental fairness, courts have a greater obligation to follow the law. Unlike Solomon, today's judges cannot base their decisions only on fundamental fairness. <u>Id.</u>

*Mosesson v. Rach*, 2001-Ohio-3232, ¶ 11 (7th Dist. Mar. 28, 2001). Under Ohio law a court "may not reform a contract unless the proponent of reformation establishes the existence and terms of an underlying agreement, which the court can instate in writing through reformation." *Bank of Am., N.A. v. Seymour*, 2019-Ohio-2884, ¶ 22 (10th Dist.). And to "prevail in an action to rescind a contract on the basis that it was procured by fraud, the proponent of rescission must establish the applicable elements by clear and convincing evidence. *Owens v. Heilmann*, 12th Dist. Butler No. CA95-04-081, 1996 Ohio App. Lexis 427, at *5-6 (Feb. 12, 1996).

{¶67} Here, as discussed above, the Court has concluded that Plaintiff has not proven its civil claims of breach of contract, breach of fiduciary duty, fraud, civil conspiracy, and declaratory judgment against Defendant by the requisite degree of proof. And, in this instance, the equitable remedy of reformation of the parties' Inter-Institutional Agreement is not available because Plaintiff has not established the existence of terms of an underlying agreement that the Court can instate.

{¶68} After carefully weighing the evidence presented at trial, the Court holds that equity does not support Plaintiff's claim of unjust enrichment, notwithstanding Defendant's lack of precision and candor during the parties' negotiation for the backdated Inter-Institutional Agreement.

## V.    Conclusion

{¶69} For reasons set forth above, the Court holds that Plaintiff has not proven its civil claims by the requisite degree of proof. The Court further holds that Defendant is entitled to a judgment in its favor.

_____
DAVID E. CAIN
Judge

[Cite as *Bavaria v. Ohio State Univ.*, 2024-Ohio-3217.]

FREE STATE OF BAVARIA,
REPRESENTED BY THE UNIVERSITY
OF WURZBURG

    Plaintiff

    v.

THE OHIO STATE UNIVERSITY

    Defendant

Case No. 2022-00495JD

Judge David E. Cain

<u>JUDGMENT ENTRY</u>

## IN THE COURT OF CLAIMS OF OHIO

{¶70} For reasons set forth in the Decision filed concurrently herewith, the Court holds that Plaintiff has not proven its civil claims by the requisite degree of proof. Judgment is entered in favor of Defendant. Court costs are assessed against Plaintiff. The Clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
DAVID E. CAIN
Judge

**Filed July 19, 2024**
**Sent to S.C. Reporter 8/23/24**